**UNITED STATES of America, Appellee,**

v.

**Bruce DUNN, Richard Austin Mandeville, Joseph Harvey Zeligs, Darold Lanier Milligan, Richard Lee Shinafelt, Appellants.**

Nos. 76–2172, 76–2179, 76–2238, 76–2300 and 76–2429.

United States Court of Appeals, Ninth Circuit.

Nov. 11, 1977.

As Modified Nov. 16, 1977.

As Amended Dec. 14, 1977.

James M. McCabe (argued), San Diego, Cal., Howard B. Frank (argued), San Diego, Cal., Peter J. Hughes (argued), of Sheela, Lightner, Hughes & Castro, San Diego, Cal., Charles R. Khoury, Jr. (argued), San Diego, Cal., for appellants.

Daniel K. Green, Asst. U. S. Atty., Terry J. Knoepp, U. S. Atty., Shelby R. Gott, and Stephen V. Pefix (argued), on the brief, Asst. U. S. Attys., San Diego, Cal., for appellee.

Before BROWNING and ELY, Circuit Judges, and EAST,* Senior District Judge.

ELY, Circuit Judge:

Appellants Dunn, Mandeville, Zeligs, Milligan, Shinafelt, and others not parties to this appeal, were indicted on four counts of conspiracy and attempt in respect to possession, importation, and intended distribution of hashish, violations of 21 U.S.C. §§ 841(a)(1), 846, 952, 960 and 963. Following a three-week trial and almost two weeks of deliberation, the jury found Zeligs, Shinafelt, Dunn and Milligan guilty on all four counts. Mandeville was found guilty on counts I and III only, those relating, respectively, to conspiracy and attempt to import a controlled substance.

Subsequent to the jury's verdicts, appellants moved for judgments of acquittal or for a new trial, Fed.R.Crim.P. 29(c), 33. The motions were denied. Thereupon, the court entered judgments of conviction and imposed sentences upon all appellants. They now appeal.

The appeal is based, *inter alia,* upon the alleged insufficiency of the evidence. For reasons hereinafter stated, we have concluded as a matter of law that the evidence was indeed insufficient as to Dunn, Milligan, Shinafelt, and Mandeville; accordingly, we reverse the judgments of conviction as to them. However, we find that the evidence was overwhelming as to the guilt of Zeligs of the offenses with which he was charged, and the judgments against him are therefore affirmed.

I. FACTS

The core of the Government's case, that upon which the indictment was founded, related solely—and we cannot emphasize this point too strongly at the outset—to the abortive effort by the appellants and others (1) to effect the conversion of certain empty computer cabinets so as to make them suitable for containing and concealing a large quantity of hashish, (2) to transport such

* Honorable William G. East, Senior United States District Judge, District of Oregon, sitting by designation.

containers to confederates in Beirut, Lebanon, (3) to have them loaded with hashish in Beirut, (4) to import them into the United States in the guise of computers, and (5) to distribute the hashish so imported within this country. The scheme's success was thwarted when the computer cabinets [hereinafter referred to simply as "computers"][1], along with a ton of hashish and the two confederates, were intercepted in Beirut. The confederates are, or, at the time of the trial, were serving terms of confinement in Lebanon.

Viewing the evidence, as we must, in the light most favorable to the Government, *Glasser v. United States,* 315 U.S. 60, 62, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. Ramos,* 476 F.2d 624, 626 (9th Cir. 1973), *cert. denied,* 414 U.S. 836, 94 S.Ct. 182, 38 L.Ed.2d 72 (1973), it is clear that the prime movers of *this scheme* (emphasizing, once again, the only scheme in the indictment) were Zeligs, Hillman, Geiger, and Humphries.[2] As is not altogether unusual in cases of this type, however, the Government cast a wider net,[3] enmeshing Mandeville, Shinafelt, Dunn, and Milligan. Since there was little or no evidence directly connecting those defendants with the computer operation, extensive evidence was adduced by the prosecution in respect to other transactions, concerning oceanographic buoys and transformers, in which their involvement was asserted.

■ The Government's evidence in respect to buoys and transformers was tendered ostensibly (1) to lend circumstantial proof to the allegation that the hashish secreted in the computers was ultimately destined for the United States and (2) to establish a prior similar course of conduct, or *modus operandi,* among those defendants involved with the buoys and transformers and those involved with the computers. *See, e. g., Nye & Nissen v. United States,* 336 U.S. 613, 618, 69 S.Ct. 766, 93 L.Ed. 919 (1949); *United States v. Nunez,* 483 F.2d 453 (9th Cir.), *cert. denied,* 414 U.S. 1076, 94 S.Ct. 594, 38 L.Ed.2d 483 (1973); *United States v. Bonnano,* 467 F.2d 14 (9th Cir. 1972), *cert. denied,* 410 U.S. 909, 93 S.Ct. 964, 35 L.Ed.2d 271 (1973). But the prosecution *never* established that any criminal conduct occurred or was contemplated with respect to the buoys and transformers despite repeated assurances to the District Court that such proof would be forthcoming. Because the Government failed to connect the buoy and transformer transactions with those forming the basis of the indictment, the court erred in admitting this evidence and then allowing it to remain over repeated objections and motions to strike.[4] This error was so prejudicial that were it not for the obvious guilt of Zeligs in the computer smuggling operation, we would

1. The computer cabinets were neither capable of nor intended for use as functional computers. For the sake of convenience, we shall refer to the computer cabinets simply as "computers," as was done at trial and in the briefs on appeal.

2. Of these only Zeligs is before the court. Hillman and Geiger, although named in the indictment, could not for obvious reasons be tried. What happened to Humphries is not clear; although named as a defendant and participating in the trial to some extent, he disappears from the record for some reason not clear to us. Two people named Wright were apparently involved, and references are made to them in the record and briefs, but they were not named as defendants or co-conspirators in the indictment in this case.

3. *United States v. Falcone,* 109 F.2d 579, 581 (2d Cir. 1940), aff'd, 311 U.S. 205, 61 S.Ct. 204,

85 L.Ed. 128 (1940), wherein Judge Learned Hand wrote:

> "[S]o many prosecutors seek to sweep within the dragnet of conspiracy all those who have been associated in any degree whatever with the main offenders. That there are opportunities of great oppression in such a doctrine is very plain, and it is only by circumscribing the scope of such all comprehensive indictments that they can be avoided."

4. This case strongly demonstrates the dangers of judicial permissiveness, especially in jury trials and most especially in conspiracy cases. Mr. Justice Jackson, himself a highly experienced trial lawyer, pungently observed, "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction." *Krulewich v. United States,* 336 U.S. 440, 445 at 453, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring).

feel compelled to reverse as to him also. *Cf. United States v. Bonnano, supra,* at 17.

Despite valiant efforts by the Government to overcome the force of *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and its numerous progeny, including our *Rocha v. United States,* 288 F.2d 545 (9th Cir. 1961), *cert. denied,* 366 U.S. 948, 81 S.Ct. 1902, 6 L.Ed.2d 1241 (1961) and *Daily v. United States,* 282 F.2d 818 (9th Cir. 1960), the evidence does not, as we see it, provide the rim for the wheel necessary to bind together the appellants, other than Zeligs, with the single conspiracy charged in the indictment. In fact, there is not even a hub. We are not here dealing with the ordinary claim of variance between an indictment and proof or proof of multiple conspiracies without a common bond. Rather, we here have no proof whatsoever of any criminal conspiracy on the part of those appellants other than Zeligs. In these circumstances we deem it necessary to outline in some detail the evidence and its bearing on the various transactions.

## A. COMPUTERS.

Following acquisition of the computer cabinets, apparently by Geiger, modifications were deemed necessary. Geiger arranged, early in 1975, for these modifications to be accomplished in the custom metal workshop of one Ali Roushan in Costa Mesa, California. This work consisted of installing square corners in lieu of the original rounded corners by welding and painting them so as more closely to simulate the appearance of operative computers. While this work was progressing, Zeligs and Humphries frequently visited Roushan's premises. Conveniently, a portion of those premises was occupied by a body and fender man, who was able to do a final touch-up, including smoothing the newly-welded edges and painting the computers.

When the modifications were completed in February, 1975, the computers were transferred to a warehouse in Escondido, California, which was under lease to Mandeville.[5] While located in Mandeville's warehouse, the computers were custom-crated for shipment. In early May, 1975, a rented truck was backed into the warehouse and, by means of a forklift rented by Zeligs under the name "Mandeville Engineering Company,"[6] was loaded with the wooden crates housing the computers. At the same time, a white van was loaded with certain materials. Hillman, Geiger, and Zeligs then drove the crates to a public storage facility a short distance away, unloaded them by means of the forklift, and finally deposited them in a rented storage unit.

Several months later, in early July, Hillman, Geiger, and Zeligs transferred the crated computers from the storage unit to a rented truck by means of a rented forklift and transported them to the premises of an import-export brokerage house in Los Angeles. A member of the export-import firm prepared shipping documents for the shipment of the computers to Geiger and Hillman, in Lebanon. A "G.T.E." (General License Temporary Export) was obtained, indicating anticipated return to the United States, upon representations to the export-import firm by Hillman and Geiger.[7] Shipping tags were placed on the crates and they were then transported by these three appellants to an airline freight terminal where they were unloaded and taken inside the terminal's warehouse for shipment to Beirut. Shortly thereafter, one of the confederates, Geiger, purchased a round trip airplane ticket to and from Beirut.

---

**5.** The state of title to this warehouse and the knowledge of its use are of considerable importance, as will be seen.

**6.** The circumstances surrounding the renting of this forklift are also significant and are discussed below.

**7.** According to the firm's agent who prepared the shipping documents, Geiger and Hillman stated that the computers were not to be sold overseas; rather, they were to be returned to the United States after being exhibited. This evidence provided the linchpin essential to the jurisdiction of the District Court over the criminal enterprise alleged in the indictment. *See* Part II.A., *infra.*

The computers were shipped on July 8. Geiger departed on the following day, July 9. Approximately one month later, Geiger and Hillman were arrested at the Beirut airport[8] as they were attempting to clear the computers out of Beirut. The computers, according to the shipping manifests, were destined for Switzerland. The crates and computers contained therein were indisputably identified as being among those to which we have heretofore referred. They were found to contain about one ton of hashish.

As previously stated, there can be no reasonable doubt that the principal figures in all phases of the computer transaction were Zeligs, Geiger, Hillman, and Humphries. As to the involvement of the other appellants in the computer transaction, the evidence was as follows:

### 1. Mandeville

Mandeville leased the Escondido warehouse approximately eight months prior to commencement of the computer operations in August, 1974. The lease was for a duration of two years, but in May, 1975, it was terminated by someone purporting to represent Mandeville. Notably, this termination occurred around the time when the computers were removed to the public storage facility.

All operations at the Escondido warehouse, insofar as the evidence disclosed, were carried out solely by Zeligs, Geiger, Hillman, or Humphries, as were the activities connected with the transfer, loading, unloading, and shipment of the crates containing the computers. There was no evidence that any other defendant, including

Mandeville, so much as visited the warehouse during the month or so that the computers were there.

The forklift, as noted, was rented by Zeligs using the name "Mandeville Engineering Company."[9] While the warehouse and forklift situations with respect to Mandeville may be suspicious, they are, at best, the thinnest evidence that he participated in the computer transaction.

### 2. Shinafelt

The only connection that could conceivably link Shinafelt with the computer transaction was his ownership of a white vehicle, referred to as a white pickup truck, which was being worked on by Zeligs in a portion of Roushan's premises while work on the computers progressed.[10]

### 3. Milligan and Dunn

There was absolutely no direct evidence tying Milligan or Dunn to the computer transactions. As to Dunn, the prosecution admits that there was little "quantitative" evidence implicating Dunn in any aspect of the case, but it argues that this is offset by the "quality" of the evidence. We find the asserted incriminating evidence to be nonexistent and therefore lacking both quantity and quality. Virtually the same is true as to Milligan.

In this state of affairs, the prosecution obviously believed it necessary to go beyond the computer transactions in order to raise a jury issue as to Shinafelt, Mandeville, Dunn, and Milligan; therefore, evidence connected with other transactions, involving buoys and transformers, was presented by the prosecution and admitted over vigorous objections.

---

**8.** How Hillman reached Beirut is not of record but is probably immaterial.

**9.** There was no evidence that Mandeville himself ever used or did business under that name—although telephone records described him as "engineers" and "welders." Nor is there any evidence that he authorized or even knew of Zeligs' use of it in this or any other transaction.

**10.** There are references to white vehicles scattered confusingly throughout the record—the

white "pickup" worked on by Zeligs, the white "van" used in transporting something along with the computers, and, in a subsequent context, a white "Mercedes" owned by Shinafelt. It is questionable that these were one and the same vehicle. No references to license numbers or other identification appear in the transcript, although the various premises appear to have been under close surveillance for some months, and ordinary terminology would indicate that these were three quite different vehicles.

## B. THE BUOYS AND TRANSFORMERS.

There were two sets of transactions involving oceanographic buoys, one occurring in 1973 and the other in 1975, as well as one set of transactions concerning large electric transformers. None of these transactions in any way involved any of the principal figures in the computer transactions, namely, Zeligs, Geiger, Hillman, or Humphries.

### 1. *Buoys: 1975*

■ Shinafelt and Dunn leased a warehouse in Oceanside, California,[11] under fictitious names.[12] The lease was for a two-year term beginning in June, 1975, several days after the lease on the Escondido warehouse was terminated. No connections between this warehouse and Mandeville's warehouse in Escondido were established except that on May 29, 1975, Mandeville transported a load of lumber, using a rented truck, from the latter warehouse to the former.

At various times, oceanographic buoys were observed inside the warehouse in Oceanside, and Mandeville, Dunn, and Shinafelt were observed to be inside. Mandeville did welding work on the buoys. On one day, Mandeville, Dunn, and Shinafelt cut stencils, including one for "Turant Leas-

ing." Also, steel tank heads were ordered by someone driving a white Mercedes, like that owned by Shinafelt, and were picked up by someone driving a black Pantera, like that owned by Dunn.[13]

In July, 1975, Dunn arranged for air cargo containers to be built to house the buoys. Mandeville picked up these containers when they were ready. In addition, during this same month, Mandeville acquired some military duffel bags. At one point, Mandeville took one of these bags to a storage facility and weighed it. When the buoys were eventually cut open, duffel bags were found inside, laden with sand.

Dunn applied for a customs carnet[14] for the buoys under the name of "Turant Leasing." The carnet application noted anticipated shipment of six buoys to Europe, Australia, and Japan. Lebanon, at the time of these events, was not a country concerned in the carnet program. A customs official specializing in carnets noted that such a carnet would nonetheless be useful in exporting merchandise from Lebanon. This testimony, however, was of doubtful relevance absent any showing that the buoys were intended for shipment to or through Lebanon. In any event, the carnet was never perfected and the buoys were never exported, having been seized at the

---

11. Escondido and Oceanside are both in the northwestern section of San Diego County, California, some twenty miles apart, the latter being on the Pacific Ocean and the former somewhat inland.

12. The Government attempts to make much of the fact that a number of the transactions here considered were carried on under what are technically "fictitious names." There is, of course, nothing illegal whatsoever about transacting business under a fictitious name if the purpose is not to defraud. It is a common business practice, particularly on the part of sole proprietorships and partnerships and is expressly authorized in the laws of the State of California, where most of these transactions occurred. Cal.Bus. & Prof.Code, §§ 17900 et seq. As for individuals, they may legally call themselves anything they wish, despite the lay concept of a person's "real" name, provided of course the name is not used for an illegal purpose. There are also frequent references to "sham" corporations, the meaning of which is

not clear to us and cannot have been clear to the jury. An entity either is or is not a corporation, depending on whether legal requirements have been satisfied. We deplore the prosecution's repeated use of such pejorative language, which can only have been calculated to influence the jury improperly. Its repetition, both in the District Court and here, was inexplicable and inexcusable.

13. Those observing these vehicles seemingly did not even see fit to record or trace license numbers or other means of identification of the vehicles, a careless oversight, at best.

14. A member of the United States Consular Service testified that a carnet is an international customs document allowing duty-free temporary exportation of merchandise from one participating country into another participating country, return to the country of origin being contemplated.

Oceanside warehouse, along with duffel bags, sand, and all.[15]

### 2. Buoys: 1973

The only evidence with respect to the earlier, 1973, buoy transaction was scanty in the extreme and wholly fails to confirm the prosecution's repeated suggestions that it involved smuggling. A carnet application was filed by two of the defendants, Shinafelt and Dunn, as representatives of "Oceanographic Leasing."

In any case there is no showing of what happened to these buoys, although it may be inferred that they were returned to the United States. Nor was there a showing of any significant similarity, apart from the fact that they involved buoys and a carnet, with the 1975 buoy transaction, let alone the computer or transformer transactions.

### 3. Transformers

The 1975 transaction involving the transformers apparently never took place. Dunn, Shinafelt, and possibly Milligan seemingly intended to ship two large transformers[16] to Dubai, in the United Arab Emirates.[17] The services of some freight forwarders were engaged, it being represented that the shipment was for purposes of experimentation only and that the transformers were to be returned to the United States.

The transformer transactions were carried out almost entirely under names that were impossible, apparently, to trace to any individual. One fictitious name listed as a reference with a phone answering service was that of Dunn. The person connected with the service stated that she recognized both Shinafelt and Dunn as persons with whom she had dealt.

### C. MISCELLANEOUS EVIDENCE.

Evidence as to alleged participation of Zeligs, Hillman, Geiger, or Humphries in the buoy and transformer operations was non-existent. In an apparent attempt to intertwine the various alleged complicitors, the prosecution introduced evidence that Shinafelt, Dunn, Milligan, and Mandeville had been acquaintances since junior high school days and that they met together at the Dunn household periodically. An attempt was also made to locate the main planning headquarters of the entire series of operations at Shinafelt's ranch in Bonsall, California, and the presence at this ranch of Milligan, Dunn, Milligan's girl friend, and others was established. A like attempt was made to locate the main operating headquarters at the Escondido and Oceanside warehouses. Finally, the prosecution produced an elaborate analysis of common telephone facilities and answering services used by various of the individuals involved and perhaps dozens of others.

## II. ANALYSIS.

### A. Jurisdiction (18 U.S.C. § 3231 (1970)).

■ Our preliminary question is whether the evidence shows a conspiracy or attempt to violate any United States laws. Al-

---

**15.** An expert on oceanographic buoys testified that the buoys, though functional, were of an undesirable design for ocean use and would be short-lived due to poor construction.

**16.** The transformers, unlike the buoys (*see* note 15, *supra*), were totally functional devices. The Government cites no evidence that the transformers had been or were intended to be tampered with in ways facilitating a smuggling operation.

**17.** Here again, the prosecution attempts, almost in desperation it would seem, to find some sinister connection between the United Arab Emirates and Lebanon. It purports to find *something suspicious in telephone calls made by Milligan to his girl friend from Dubai*

and Abu Dahbi in April and May, 1975. In fact, Beirut, on the Mediterranean, and the Emirates, on the Persian Gulf, are at almost diagonally opposite ends of the vast Arabian Peninsula, some 1200 air miles apart. True, Milligan was in the "Middle East," a loose term for a large area variously defined in standard reference works as (1) the former Ottoman Empire, (2) Southwestern Asia and Northeastern Africa, (3) the area from Libya to Afghanistan, (4) the area between Constantinople (Istanbul) and the borders of China, plus possibly Egypt. The only common feature seems to be the predominance (with notable exceptions) of Moslem culture.

though the answer is not wholly free from doubt, we believe that the District Court justifiably concluded that the crimes charged in the indictment were cognizable in the United States. As noted, *supra,* the computers were shipped on a temporary export license, and the preparer of the license was told by Hillman and Geiger that the computers would not be shipped for sale, but would be returned to the United States after being exhibited. Thus, there was sufficient prima facie evidence from which to conclude that the scheme, if proved, would constitute a violation of laws of the United States. *Cf. United States v. Croxton,* 482 F.2d 231 (9th Cir. 1973) (evidence of conspiracy was sufficient even though parties had not finalized specific means for transporting controlled substance into the United States).

### B. *Sufficiency of the Evidence Under the "Slight Evidence" Rule.*

#### 1. *"Slight Evidence" Rule.*

It is sometimes said, as the Government here states in its brief, that " '[O]nce the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it'," quoting from *United States v. Knight,* 416 F.2d 1181, 1184 (9th Cir. 1969), which in turn quotes from earlier cases. We confess to having repeatedly proliferated, although we did not initiate, this statement, a principle that has become part of the cant in conspiracy cases. The litany is highly misleading if taken out of the context of the particular cases in which it was made. *E. g., Fox v. United States,* 381 F.2d 125, 129 (9th Cir. 1967); *Diaz-Rosendo v. United States,* 357 F.2d 124, 130 (9th Cir. 1966), *cert. denied,* 385 U.S. 856, 87 S.Ct. 104, 17 L.Ed.2d 83 (1966); *United States v. Nunez, supra;* and

numerous others.[18] So taken, and construed to imply that participation in a criminal conspiracy may be proved by evidence that would be inadequate to prove the commission of some other criminal act, the so-called "slight evidence rule" would vitiate the Government's ever-present burden of proof, the requirement that guilt must be proved to a moral certainty and beyond a reasonable doubt, the presumption of innocence, the rule that all doubts must be resolved, and equally plausible inferences drawn, in favor of defendants, and other traditional foundations of our nation's system of criminal justice.[19]

Such drama was clearly never so intended. The statement from *Knight,* quoted above and often quoted elsewhere, obviously was intended to state the substantive law of conspiracy and not the law regarding evidence, burden of proof, or standards of appellate review as to sufficiency of evidence. Indeed, in the very next paragraph of that opinion, *supra,* the Court further expounded:

> "It is sufficient if the acts and conduct of a defendant were of such character that the minds of reasonable men could conclude therefrom that an unlawful agreement or understanding existed, and that the defendant, with knowledge of the existence of the unlawful enterprise, acted to further it."

■ Conspiracy in the criminal law, as defined by the relevant statutes, is a crime. Those *knowingly* participating in the conspiracy in any respect or to any degree are guilty of that crime, but their guilt must be established under the same standards applicable to those charged with any other crime—neither more nor less—and the suf-

---

18. Our recent decisions in *United States v. Costey,* 554 F.2d 909 (9th Cir. 1977) and *United States v. Peterson,* 549 F.2d 654 (9th Cir. 1977) may represent efforts to clarify the slight evidence test, but we respectfully submit that neither adequately does so.

19. Thus, in *Peterson, supra,* 549 F.2d at 657, the court explained:

> "The requirement of only slight evidence does not eliminate the government's need to introduce that minimal quantum of proof independently establishing that each defendant 'entered, participated in, or furthered the conspiracy.' " *United States v. Spanos,* 462 F.2d 1012, 1016 (9th Cir. 1972); *citing United States v. Cianchetti,* 315 F.2d 584, 587 (2d Cir. 1963).

ficiency of the evidence is subject to the same standards of review.[20]

 Accordingly, we think it appropriate here to restate the slight evidence rule correctly and as we are reasonably certain that our predecessors intended it: Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict him with knowing participation in the conspiracy. Thus, the word "slight" properly modifies "connection" and not "evidence." It is tied to that which is proved, not to the type of evidence or the burden of proof.[21]

## 2. Sufficiency of the Evidence.

 In disposing of a motion for a judgment of acquittal, the District Court applies the same standard as does the Court of Appeals in reviewing the disposition:

> "[V]iewing the evidence in a light most favorable to the government as prevailing party, is the court satisfied that the jurors reasonably could decide that they would not hesitate to act in their own serious affairs upon factual assumptions as probable as the conclusions that the defendant is guilty as charged?"

*United States v. Kaplan,* 554 F.2d 958, 963 (9th Cir. 1977). With this test in mind, we turn again to aspects of the evidence as summarized above. Much of what follows is repetitious. The justification is critical analysis.

**20.** The preceding statement is obviously not intended to cover the whole body of law relating to conspiracy and evidence with respect thereto, such as the role of inference, circumstantial evidence, distinctions between conspiracies and attempts, and other aspects of this complicated crime.

**21.** Indeed, after much reflection we are of the mind that the slight evidence rule may be of doubtful appellate application when the issue for review concerns whether the defendant was connected with the conspiracy *at all.* The Fifth Circuit has expressed similar doubts. *United States v. Alvarez,* 548 F.2d 542, 544 (5th Cir. 1977). In *Alvarez,* the court wrote:

The only common bridges remotely established between the computer and the buoy-transformer transactions—indeed the only persons having any discernible connection with both—are Mandeville and Shinafelt. We now look to these two once more:

### a. Mandeville:

Mandeville's connections relate to his leasehold of the Escondido warehouse and Zeligs' rental of the forklift under the name "Mandeville Engineering Co." The bare facts have already been set forth. But, having been stated, they raise more questions than they resolve.

### i. The Escondido Warehouse

In August, 1974, Mandeville, in his own name and for a period of two years, leased the Escondido warehouse. The computers were transferred there at a later date, following the completion of the work done on the computers at Roushan's place of business by him and the body and fender man. While at the warehouse, the computers were crated and in May, 1975, so crated, they were transported to a public storage facility. At about the same time, a purported representative of Mandeville contacted the lessor of the premises and cancelled the lease.

Much has been made by the Government of the timing of these transactions. A point which has not been sufficiently stressed, however, is that effective June 1, 1975, Shinafelt and Dunn leased a warehouse at Oceanside. Since the Escondido

> "It being of the nature of a conspiracy to conceal itself, the 'slight evidence' rule finds its proper application where persons are clearly connected to the conspiring group or are found acting in such a manner as unmistakably to forward its purposes. In such instances, given the clandestine character of such projects, slight additional evidence suffices to base an inference that one who had been shown beyond a reasonable doubt to be a participant was as well a *knowing* participant. But where, as here, the question is whether a defendant was connected with the conspiracy at all, to apply such a rule is to risk convicting him of the crime itself upon 'slight evidence.'"

*Id.* (emphasis in original).

lease had been terminated, it was clearly reasonable that the latter premises be wholly vacated. A part of this evacuation, of course, would necessarily consist of the removal of the computers and Mandeville's transfer of the lumber, for whatever purpose it was being used, to Oceanside.

The circumstances under which, and by whom, the arrangements for the occupancy of the Escondido warehouse by the computers and those connected with them is not known and probably never will be. But from this, nothing sinister can be inferred beyond a reasonable doubt. The new acquisition of the Oceanside warehouse is fully sufficient to explain the coincidental timing of the cancellation of the Escondido lease. It also explains the otherwise puzzling step of moving the computers from the Escondido warehouse to the public storage facility.[22]

ii. *The Forklift Rental*

In connection with the repeated shuffling around of the computers among various warehouses, storage facilities, airline terminals, and the like, a forklift was employed which had been rented by Zeligs under the name of "Mandeville Engineering Company." In view of the fact that Zeligs' testimony in respect to the circumstances of his use of this name was not forthcoming, and why this name was used probably will never be certainly known. The name had never been used by Mandeville himself, although he identified himself for certain purposes as an engineer, and it seems as likely as not that the name was, either on his own initiative or at the suggestion of a person unknown, assumed by Zeligs, who habitually did not use his own unusual name in connection with the computer transactions. Possibly Zeligs used the name because Mandeville had had prior dealings with the forklift rental agency in connection with the buoys. Possibly Zeligs knew that the warehouse was leased in the name of Mandeville and felt that the removal of the property from the warehouse would be less suspicious if Mandeville's name were connected therewith. In any event, there is no evidence that Mandeville ever authorized either the rental of the forklifts or the use of his name in that connection. In fact there is no showing whatsoever of any contact of any kind between Zeligs and Mandeville.[23]

Finally, insofar as Mandeville is concerned, it is worthy of note that even though faced with a miasma of evidence confusing the computer, buoy, and transformer transactions, the jury apparently had its greatest difficulty in arriving at a verdict in connection with Mandeville. Not only was it the last of the verdicts, which were returned separately, as permitted by Fed.R.Crim.P. 31(b), but it was the only one in which a defendant was found guilty of less than all of the four counts charged.

b. *Shinafelt:*

Shinafelt is even less closely connected. He knew both Mandeville (from junior high school days) and Zeligs, at least from the latter's work on his pickup truck. In the context of paperback fiction, he would have been the intermediary between the computer group and the buoy-transformer group, the one who arranged for Mandeville to allow the storage of the computer in his warehouse and suggested to Zeligs that he use Mandeville's name in connection with the forklift rental. Suspicious? Of course. But proof beyond a reasonable doubt? By no means.

---

**22.** Another consideration that would seem to isolate Mandeville from any connection with the computer operation was the fact that he was, both in fact and according to telephone records, a welder in his own right and did considerable welding work with respect to the buoys. If he had been associated with the computer transaction, it is strange indeed why a third party, Roushan, was employed, at considerable risk, to do the welding work connected with the computers, consequently exposed at his shop, rather than worked on in the relative seclusion of the Escondido warehouse, as was done in the case of the buoys located in the Oceanside warehouse.

**23.** Of course, the Government is not required to show direct contact or explicit agreement between defendants charged with conspiracy. *E. g., United States v. Perry*, 550 F.2d 524, 528 (9th Cir. 1977).

## III. CONCLUSION.

■ An overall review of the record leaves us with the surest conviction that there was not sufficient evidence to justify the convictions of Dunn, Milligan, Mandeville, and Shinafelt. Reviewing the evidence as a whole, we can only conclude that the picture laid before the court and jury was one of a group of long-time friends on the one hand, and mutual acquaintances of some of them on the other, who were engaged in various transactions of a shady or suspicious nature, but not shown either to have been illegal or to have had any significant resemblance to, or connection with, the computer-hashish operation. In a similar context, we long ago wrote:

"There is, of course, evidence of an intimate personal relationship between William and Josephine, who handled the heroin in question. But guilt may not be inferred from mere association. *Ong Way Jong v. United States*, 9 Cir., 245 F.2d 392, 394."

*Evans v. United States*, 257 F.2d 121, 126 (9th Cir. 1958), *cert. denied*, 358 U.S. 866, 79 S.Ct. 98, 3 L.Ed.2d 99 (1958); *accord, United States v. Kompinski*, 373 F.2d 429 (2d Cir. 1967). More recently, we emphasized:

"Neither mere association and activity with a co-conspirator nor even knowledge of the conspiracy's existence—not proven here—meets the standards we require to bind a defendant to the conspiracy charged."

*United States v. Peterson*, 549 F.2d 654, 658 (9th Cir. 1977); *accord, United States v. Basurto*, 497 F.2d 781, 793 (9th Cir. 1974).

■ Some aspects of the 1975 buoy operation suggest that it may have constituted a smuggling attempt of some kind, as is conceivable in any case wherein essentially useless but hollow containers are shipped abroad with the apparent intent of having them returned, particularly when they are shipped loaded with useless materials in an apparent attempt to avoid weight discrepancies on return. On the other hand, the intent may have been to defraud certain purchasers. It could have been an effort to establish a reputation for these various individuals as customary exporters and importers of heavy objects to and from the Middle East for some ulterior purpose, or the intent may have been something entirely different that does not readily suggest itself. But indulging in such speculations is contrary to well-established principles. We do not deny certain broad similarities, but these, such as they are, could have been found between perfectly innocent transactions. Of more legal and dispositive significance, they fail to show beyond a reasonable doubt any connection between the two groups. To affirm all of the convictions herein would be to endorse the principle of guilt by association to an extent hitherto unknown in our experience. While inferences have their place in the chain of evidence in any trial, " '. . . charges of conspiracy are not to be made out by piling inference upon inference . . ., thus fashioning . . . a dragnet to draw in all substantive crimes.' " *Direct Sales Co. v. United States*, 319 U.S. 703, 711, 63 S.Ct. 1265, 1269, 87 L.Ed. 1674 (1943); *Ingram v. United States*, 360 U.S. 672, 680, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959). *See also United States v. Grow*, 394 F.2d 182, 199 (4th Cir. 1968), *cert. denied*, 393 U.S. 840, 89 S.Ct. 118, 21 L.Ed.2d 111 (1968). The whole concept of conspiracy prosecutions has been the subject of much debate, *see Krulewich v. United States, supra*, and there is much to be argued on both sides, but to find all appellants guilty here would be to extend the breadth of conspiracy cases and the liberality permitted in proving them far beyond the utmost limits.

In our study of the record here, it has become clear that the situation is remarkably akin to that eloquently summed up by Chief Judge Lumbard in *United States v. Bufalino*, 285 F.2d 408, 419 (2d Cir. 1960):

"The administration of our system of criminal justice and our basic concepts of fair dealing are centered on the requirement that in each case we reach a result based solely on the charges made in the particular indictment and on the evidence which appears on the record with regard to those charges. Doubtless many of [one

of the defendants'] visitors are bad people, . . . . But bad as many of these alleged conspirators may be, their conviction for a crime which the government could not prove, on inferences no more valid than others equally supported by reason and experience, and on evidence which a jury could not properly assess, cannot be permitted to stand."

It may appear that the jury's verdict was somewhat incongruous, inasmuch as the jury found Dunn and Milligan, as to whose guilt there was scarcely a scintilla of incriminating evidence, guilty on all four counts, Shinafelt, as to whom there was even less proof of guilt, likewise guilty on four counts, and Mandeville, as to whom the prosecution's evidence was somewhat greater but still wholly inadequate, guilty on two counts.

■ The nature of the verdicts, however, does not, of course, afford a justifiable basis for the reversal of the convictions of all the appellants. In the first place the admissible evidence against Zeligs was "overwhelming." Fed.R.Crim.P. 52(a); *United States v. Fernandez*, 497 F.2d 730, 735 (9th Cir. 1974), *cert. denied*, 420 U.S. 990, 95 S.Ct. 1423, 43 L.Ed.2d 670 (1975); *cf. Bates v. Nelson*, 485 F.2d 90 (9th Cir. 1973), *cert. denied sub nom. Chavez v. McCarthy*, 414 U.S. 1134, 94 S.Ct. 877, 38 L.Ed.2d 759 (1974). Secondly, the law is uniform that the verdicts against multiple defendants are to be considered separately as to each defendant and as to multiple counts against a single defendant, each count is to be considered separately.[24] This is true even though the evidence is identical as to each defendant and count, *United States v. Russo*, 335 F.2d 299, 301 (7th Cir. 1964), *cert. denied*, 379 U.S. 962, 85 S.Ct. 651, 13 L.Ed.2d 556 (1965). Thus, in the leading case of *Apodaca v. United States*, 188 F.2d 932 (10th Cir. 1951), which

in some respects closely resembles our present case, three defendants were indicted on two counts of conspiracy to violate civil rights. The evidence was virtually identical as to each defendant. Nevertheless, the court upheld the conviction of one defendant on both counts, although the verdict as to the other two defendants were, respectively guilty on count one, not guilty on count two, and vice-versa. The matter is cogently discussed in *Fuller v. United States*, 132 U.S.App.D.C. 264, 407 F.2d 1199, 1223, 1232 (1968) (en banc), *cert. denied*, 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1969).

The question does not seem to have been squarely decided by our court or by the Supreme Court. However, we feel that the law is settled nationwide, by virtually every court that has considered it, and that on grounds of uniformity, if nothing else, we cannot reverse the conviction of Zeligs.

We can, of course, reverse the convictions of the other appellants and direct the disposition of them on remand. 28 U.S.C. § 2106; *Bryan v. United States*, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335 (1950); *cf. United States v. Bufalino, supra*. Each duly filed motions for acquittal or new trial. Fed.R.Crim.P. 29(c), 33. Since the evidence against them was wholly insufficient to sustain a conviction, motions for acquittal should have been granted.

The judgment of conviction of Zeligs is affirmed. The judgments of conviction of Milligan, Dunn, Shinafelt, and Mandeville are reversed, and upon remand, the indictments against them will be dismissed. *United States v. Howard*, 432 F.2d 1188, 1191 (9th Cir. 1970) (Concurring opinion of the majority).

AFFIRMED in part; REVERSED and REMANDED in part, with directions.

24. With limited exceptions, such as where the facts forming the elements of the crimes charged in the counts or against the defendants are inherently inconsistent. *E. g.*, since a conspiracy requires at least two persons, and all are charged, but only one is convicted, the conviction cannot stand. *Apodaca v. United States, infra* at 940 (dictum) and cases cited; *but cf. United States v. Fox*, 140 U.S.App.D.C. 129, 433 F.2d 1235 (1940).