**UNITED STATES of America, Plaintiff,**

v.

**Stanley A. MEYERS, Defendant.**

**Crim. No. 83–60036–PA.**

United States District Court,
D. Oregon.

Oct. 22, 1984.

Charles H. Turner, U.S. Atty., Thomas M. Coffin, Asst. U.S. Atty., Eugene, Or., for plaintiff.

Robert J. McCrea, McCrea, P.C., Eugene, Or., for defendant.

## OPINION

PANNER, Chief Judge.

On September 8, 1983, the Federal Grand Jury for the District of Oregon filed a four-count indictment charging defendant Stanley A. Meyers with:

*Count 1*: Conspiracy to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846;

*Count 2*: Possessing approximately 17 ounces of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1);

*Count 3*: Possessing approximately 9 ounces of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1); and

*Count 4*: Possessing approximately 16 ounces of marijuana, in violation of 21 U.S.C. § 844.

Beginning February 14, 1984, the case was tried to a jury, with Judge Earl H. Carroll presiding. The jury could not reach a verdict. After the trial, Judge Carroll denied defendant's motion for a judgment of acquittal and defendant's motion for a dismissal of the indictment. Defendant appealed, but the Ninth Circuit dismissed the appeal. The parties stipulated that the second trial would be tried to the court and waived a jury. Testimony was presented in the form of the transcript of the prior trial and one live witness. The parties retain their evidentiary objections made in the prior trial. I find the defendant guilty of the second and third counts, and not guilty of the first and fourth counts.

### STATEMENT OF THE LAW

■ The first count against the defendant is for conspiracy to distribute cocaine. The elements of a criminal conspiracy are:

(1) An object to be accomplished.

(2) A plan or scheme embodying means to accomplish that object.

(3) An agreement or understanding between two or more of the defendants

whereby they become definitely committed to cooperate for the accomplishment of the object by means embodied in the agreement, or by any effectual means.

(4) ... an overt act.

*Pinkerton v. United States,* 145 F.2d 252, 254 (5th Cir.), *aff'd,* 328 U.S. 640, 643, 66 S.Ct. 1180, 1181, 90 L.Ed. 1489 (1946).

[A] conspiracy may be proved by evidence that is entirely circumstantial, and items of circumstantial evidence must be viewed collectively, not in isolation.... "An otherwise innocent act of 'relatively slight moment,' may, when viewed in the context of surrounding circumstances, justify an inference of complicity...."

*United States v. Calaway,* 524 F.2d 609, 612 (9th Cir.), *cert. denied,* 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976).

Those *knowingly* participating in the conspiracy in any respect or to any degree are guilty of that crime ...

*United States v. Dunn,* 564 F.2d 348, 356 (9th Cir.1977) (emphasis in original).

Once the existence of a conspiracy is established, evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight,* is sufficient to convict him with knowing participation in the conspiracy.

*United States v. Dunn,* 564 F.2d at 357 (emphasis in original).

The second and third counts against the defendant are for possession of cocaine with intent to distribute.

■ To convict for possessing drugs with the intent to distribute, the Government must show that a defendant knowingly possessed the drugs and that, at some point coincident with his possession, he intended to distribute them to another. *See United States v. Gomez-Tostado,* 597 F.2d 170, 173 (9th Cir.1979); *United States v. Vergara,* 687 F.2d 57, 61 (5th Cir.1982). The concept of "distribution" includes sharing drugs with a third party, and is not limited to commercial ventures. *United*

*States v. Ramirez,* 608 F.2d 1261, 1264 (9th Cir.1979).

■ Possession of drugs may be constructive as well as actual, may be joint among several individuals, and may be proven by circumstantial evidence. *United States v. Riggins,* 563 F.2d 1264, 1266 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 150 (1977).

■ The defendant's intent to distribute a drug can be inferred from the purity, price, and quantity of the drug possessed. For example, the purer the drug, the more likely that it will be "cut" or diluted, and then resold before being consumed. *United States v. Palmere,* 578 F.2d 105, 108 (5th Cir.), *cert. denied,* 439 U.S. 1118, 99 S.Ct. 1026, 59 L.Ed.2d 77 (1978); *United States v. Reese,* 561 F.2d 894, 898 n. 8 (D.C.Cir.1977).

■ The fourth count against the defendant is for possession of marijuana. With regard to this offense, the government must show knowing or intentional possession. *See* 21 U.S.C. § 844 (1981). Possession of marijuana may be constructive rather than actual, and may be established by circumstantial evidence. *United States v. Zumpano,* 436 F.2d 535, 538 (9th Cir.1970).

■ The burden of proof is on the government to prove beyond a reasonable doubt each element of the charged offenses. *Moore v. United States,* 429 U.S. 20, 22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976). To meet this burden, the government may rely on circumstantial evidence. Circumstantial evidence can be used to prove any fact, including a fact from which another fact is to be inferred. *United States v. Kelly,* 527 F.2d 961, 965 (9th Cir.1976). Moreover, even where no single piece of circumstantial evidence supports a finding of guilt, the accumulation of such evidence can support such a finding. *See United States v. Morando-Alvarez,* 520 F.2d 882, 884–85 (1975). Accordingly, to convict the defendant this court must find that the circumstantial evidence here supports a finding of guilt beyond a reasonable doubt.

## FINDINGS OF FACT

I find the following facts. The defendant Stanley Meyers was employed by the Lane County District Attorney's Office from September, 1980 to June 18, 1982. During this time, he served as Coordinator of the Lane Interagency Narcotics Team (LINT). LINT was comprised of law enforcement officers from various law enforcement agencies in Lane County, including the District Attorney's Office, the Eugene Police Department, and the Springfield Police Department. LINT was disbanded on June 18, 1982, because of budget cuts, and Meyers was laid off. He returned to work for the District Attorney's Office as an investigator on September 18, 1982, but was discharged on December 27, 1982, after his involvement in the following events.

On March 4, 1982, LINT personnel seized approximately seventeen ounces of cocaine from Edgar Regini at the Portland International Airport. Meyers headed the investigation that resulted in this seizure. LINT officers Dave Wilson, Steve Tindall, Robert Cope, and Randy Belair were also present. The LINT team brought the cocaine to the LINT office that night.

The following day, March 5, 1982, photographs were taken of the Regini evidence, including the cocaine. When the cocaine was seized, it was packaged in two clear plastic bags. One was larger than the other. After the photographs were taken, LINT officer Wilson placed the larger cocaine bag inside a manila envelope, which he marked "1–A." He then placed the other bag of cocaine inside a second manila envelope, which he marked "1–B." Wilson and his LINT partner Steve Tindall then took the cocaine to the Oregon State Police (OSP) laboratory for analysis.

After reaching the OSP lab, Tindall and Wilson gave the cocaine to OSP technician Jim Pex. Pex took small samples from the plastic bags in envelopes 1–A and 1–B, tested these samples and found them to contain cocaine. Pex preserved the remainder of the samples at the lab. He also returned the bulk of the cocaine, which was still in bags 1–A and 1–B, to Wilson and Tindall. Wilson and Tindall then returned directly to the LINT office. Once there, they placed the cocaine on Meyers' desk, where he was then sitting. Wilson also gave Meyers an envelope that Wilson had marked "For Prints." Wilson told Meyers that he thought that the plastic bags should be sent in the "For Prints" envelope to the OSP lab for fingerprint analysis. The cocaine would be removed and placed in new bags. Meyers disagreed. There is no evidence that Meyers or anyone else ever sent the two plastic bags in for fingerprinting.

I find that Meyers placed the Regini cocaine in the safe in the LINT office. The safe was at times used for the storage of drugs seized by LINT, but long-term storage of drugs in the safe was discouraged by many in the District Attorney's Office. The safe had a three number combination, which was changed whenever a new LINT Coordinator was named. In keeping with this policy, the combination was changed when Meyers took the job. Meyers received the combination and had regular access to the safe. Deputy District Attorney Jim Hunt also knew the combination and had used it to open the safe. Lane County District Attorney Pat Horton and Kelly Fex, his secretary, had individual copies of the Meyers' combination but neither used it to open the safe. Moreover, neither gave the combination to anyone else. I further find that no one else was given or learned this combination.

LINT was disbanded June 18, 1982. Sometime between June 7, 1982, and June 18, 1982, Chief Deputy District Attorney Hartstrom asked Meyers if any drugs were in the safe. Meyers denied that there were.

On October 15, 1982, Pat Horton ordered the LINT safe moved to his office where Jim Hunt opened it. Horton then checked the contents of the safe and found the "For Prints" envelope. This envelope contained the clear plastic bag marked "1–B," but did not contain the clear plastic bag marked "1–A." The envelope did contain, however,

a second, larger, clear plastic bag. Both plastic bags contained a white powdery substance. After testing, this substance proved to contain only one percent cocaine. The remainder was made up of approximately 70–80 percent flour, less than five percent sacharrin, and at least fourteen percent manitol, a crystal like substance commonly used to cut street drugs. Subsequent testing of the samples taken from the original Regini cocaine, however, showed that the samples constitute high grade cocaine. The Regini cocaine was therefore stolen, and replaced by the counterfeit mixture. I find this theft occurred between March 5, 1982, and October 15, 1982.

Another cocaine theft occurred in the LINT office. On June 17, 1982, LINT officers seized approximately nine ounces of cocaine, a pound of marijuana, and drug paraphernalia during the arrest of Robert Fous and John Lara. This cocaine, the "Fous cocaine," was packaged in two clear plastic bags when seized. One of these plastic bags was inside a zippered black plastic bag.

Meyers also headed the Fous investigation, and helped transport the Fous evidence to the LINT office on June 17. LINT officer Robert Cope was assigned to take the cocaine to the OSP lab for analysis. The next day, Cope and LINT officer Keith Burton repackaged the cocaine and marijuana into different plastic bags, and sent the original bags to the OSP lab for fingerprinting. Cope then placed the cocaine, the marijuana, and the drug paraphernalia into a cardboard box that he found at the LINT office. Appropriately, the box had the brand name "Vanish" printed on it.

Cope delivered the Vanish box to the OSP lab on October 18, 1982. OSP lab technician Ken Meneely placed the drugs and paraphernalia in the Vanish box and sealed it with masking tape.

After the Fous seizure, Meyers had instructed Cope to pick up the Fous drugs from the lab and take them to the Springfield Police Department evidence facility. This facility provided better security than the LINT office did. Cope did not pick up the Fous drugs. Instead, at 4:30 p.m. on June 29, 1982, Meyers picked up the sealed Vanish box from the OSP lab. Even though LINT had been disbanded for eleven days at this time, Meyers did not take the drugs to the Springfield evidence facility. Instead, he stated that he took the Vanish box to the abandoned LINT offices, where he unsealed the box, retrieved the cocaine and placed it in the LINT safe, and placed the box in a cabinet in the office.

On October 15, 1982, when Horton had the safe opened, he found a second manila envelope along with the "For Prints" envelope from the Regini case. This second envelope contained a large plastic bag, which held a white powdery substance, and also a zippered black plastic bag that contained another clear plastic bag, which also held a white powdery substance. The second envelope was marked "Fous, Robert & Lara, John." Handwriting analysis shows that the defendant printed these words. The "Fous & Lara" envelope was not in the Vanish box while Meneely had it at the lab.

Subsequent tests of the powdery substance in the "Fous & Lara" envelope showed that this substance was made up of the same bogus mixture found in the "For Prints" envelope. The Fous cocaine was also stolen, and replaced by the counterfeit mixture. I find that this theft took place between June 29, 1982, when Meyers picked up the Vanish box, and October 15, 1982.

Other important events occurred before the discovery of the counterfeit cocaine. On June 30, 1982, the day after Meyers picked up the Fous cocaine from the OSP lab, Meyers' partner at LINT, Randy Belair, went to the Centennial Bank in Springfield. In 1981, Meyers and Belair had opened a safe deposit box under the names of "Stan Munson" and "M.R. Moore," their undercover aliases. Belair's fingerprints were found on this box. This box, # 456, was not large enough to accommodate both the Regini cocaine and the Fous cocaine. On June 30, 1982, Belair closed this box

and rented a larger box, # 130. Both "Munson" and "Moore" signed the rental card for the new box. One of Meyers' fingerprints and three of Belair's fingerprints were found on the box. Subsequent tests by the OSP showed that the cocaine could be packaged so that both the Regini cocaine and the Fous cocaine could fit within box # 130.

On July 13, 1982, Hunt opened the LINT safe. He and Hartstrom then inventoried each item in the safe. They found no drugs in the safe. Officer Cope was also present in the office at this time. Cope testified that he could smell the strong odor of the Regini cocaine when the safe was opened. Given the testimony of Hunt and Hartstrom that they carefully examined each item in the safe, but found no drugs, I find there was no cocaine in the safe on July 13, 1982. On July 19, 1982, Horton had additional locks installed on the LINT office door to render it more secure. The Regini cocaine was stolen before July 13, 1982.

On July 8, 1982, Meyers moved to Montana, where he had obtained a job as a narcotics officer. In an initial meeting with his supervisors there, Meyers asked whether he could use "reverse stings" in his undercover work. In a traditional drug sting, the undercover officer offers to buy drugs from the suspect. In the reverse sting, however, the officer tries to sell drugs to the suspect. Meyers' supervisors told him not to conduct a reverse sting.

On July 15, 1982, Meyers rented a house from Cal Canon. Meyers then learned that Canon had a drug background, and asked a supervisor for more information about Canon. The supervisor told Meyers not to "work" Canon, as another agency was already investigating Canon. Nevertheless, Meyers approached Canon approximately five days later and asked him if he or any of his contacts would like to buy "powder," a slang term for cocaine. Meyers told Canon that the powder was worth $25,000 to $50,000, which was also the approximate combined value of the Regini and Fous cocaine. Canon did not purchase the drugs.

On August 10, 1982, Meyers returned to Eugene, where he spent eight days. While there, he accessed the new safe deposit box twice on August 17, at 11:45 a.m. and at 1 p.m. While in Eugene, Meyers also learned that he would be rehired at the Lane County District Attorney's Office due to an increase in funding. Thus, when Meyers returned to Montana on August 18, 1982, he intended to resign the Montana job. Nevertheless, on the evening of his arrival in Montana, he met with Canon and tried to sell cocaine to him, despite orders not to approach Canon about drugs. Shortly afterwards, at 1:39 a.m. of the next day, Meyers called Randy Belair in Springfield. He called Belair again only a few hours later, at 7:25 a.m.

On August 19, 1982, Meyers met with his supervisor in Montana and told him that he was resigning. The following day, the supervisor told Meyers to try to buy some drugs from Canon, in an attempt to get some results from Meyers before he left. Having finally received approval to work Canon, Meyers filed a report that described his August 18, 1982 meeting with Canon.

The government alleges that this report contains false statements regarding this meeting. I find those allegations to be true. The first false statement Meyers made is that he first met Canon on August 18, 1982. Canon testified, however, that he first met Meyers about July 19, 1982, that he met again with Meyers a day or two later, and that this second meeting specifically concerned drug trafficking. The second false statement Meyers made is that he tried to buy drugs from Canon, rather than sell drugs to Canon. Canon's testimony shows that Meyers offered to sell drugs to Canon at least twice.

At the end of August, Meyers returned to Eugene. He resumed working as an investigator for the District Attorney's Office on September 13, 1982. A month later, on October 15, 1982, the LINT safe was opened and the "For Prints" and "Fous & Lara" envelopes were discovered. On Oc-

tober 19, 1982, Pat Horton instructed Meyers and Dave Wilson to deliver these envelopes to the Springfield evidence facility. Horton did not yet know that the cocaine was bogus. He indignantly asked Meyers why he had left the drugs in the safe. Horton cannot recall that Meyers made any response to his question. Meyers and Wilson then delivered the bogus cocaine to the Springfield evidence facility, where it remained until November 10, 1982.

The bogus nature of the cocaine was discovered November 10, 1982, after a pretrial conference in the Fous case. In preparation for the conference, Cope had picked up the bogus cocaine and other non-drug evidence from Springfield, and brought them to Deputy District Attorney Dan Koenig. Koenig noticed that the marijuana seized from Fous and Lara was missing. Meyers and Cope then searched the LINT office, but did not find the marijuana.

Cope then checked for the marijuana at the OSP lab. There, Ken Meneely told him that the Fous cocaine had not been packaged in the "Fous & Lara" envelope, and that this envelope had not been in the Vanish box when Meneely first examined it. Cope then field tested the powder, and found that it was not cocaine. A subsequent lab examination confirmed his suspicions. Both the Regini and Fous cocaine were counterfeit.

At this point an investigation began. On November 10, 1982, Pat Horton, who was hospitalized with a back problem, asked Koenig and Hunt to come to the hospital. Shortly thereafter, Meyers asked Hunt what the meeting was about. Hunt answered falsely. Meyers then went to Koenig's office and asked him what the meeting was about. Koenig also answered falsely.

On Saturday, November 13, 1982, Hunt called Meyers to set up a meeting on a pretext, at the request of OSP Investigators. Hunt was unable to contact Meyers but did leave a message with Lisa Brawn, Meyers' girlfriend, asking Meyers to contact him.

At noon of November 13, 1982, Meyers and Belair went to the Centennial Bank in Springfield and closed out safe deposit box #130. The history of this box is important. It was first opened the day after Meyers picked up the Fous cocaine from the Springfield evidence facility. Meyers entered the box twice on August 17, 1982. These visits were an hour and fifteen minutes apart. Similarly, Belair entered the box twice on September 13, 1982. These visits were an hour and five minutes apart.

On September 17, 1982, the box rental was extended until October 26, 1983. Despite this extension, Meyers and Belair closed the box on November 13, 1982, over a year before the box lease would terminate. At the bank, both appeared so nervous that one teller thought that they were "casing" the bank and thought of sounding the alarm. Belair misspelled the name of his alias on the admission ticket. After closing the box, Meyers and Belair removed the box's contents, which included an accordion folder.

On November 13, 1982, Hunt and Hartstrom discovered the missing Vanish box in a wooden cabinet at the LINT office. Meyers had searched through this cabinet on November 10, but never stated that he saw the box at that time. This box contained the marijuana and paraphernalia from the Fous case.

On the evening of November 13, 1982, OSP officers Dean Renfrow and Cleve Veteto interviewed Meyers. They did not inform Meyers that the Vanish box had been discovered. When asked, however, about the whereabouts of the missing marijuana, Meyers stated that it was probably misplaced in one of the LINT cabinets.

On November 16, 1982, Meyers told Koenig and Hunt that he could not have switched the cocaine as he did not have access to the LINT office after Horton added the additional locks on July 19, 1982. The key to these locks, however, was kept in a desk drawer in the District Attorney's Office. The evidence shows that Meyers used this key to enter the LINT office to obtain a rifle there on September 13, 1982.

Thus, Meyers' statement to Koenig was false.

On November 24, 1982, investigators learned of Meyers' and Belair's prior lease of safe deposit box # 130. No one told Meyers of the discovery. On November 26, 1982, Paul Alton, another investigator at the District Attorney's Office, asked Meyers whether he then had or ever had a safe deposit box. Meyers answered no. On November 30, 1982, OSP investigators Renfrow and Veteto specifically asked Meyers whether he had any safe deposit boxes under his name or any alias. Meyers again answered no. Finally, on December 2, 1982, Meyers testified under oath before a county grand jury investigating the cocaine theft. Once more, he denied that he had ever had a safe deposit box. I find that Meyers had box # 130 at the Centennial Bank, and answered falsely to each of the above questions.

Meyers did several things which were calculated to facilitate the theft of the cocaine from the Regini and Fous cases. He stored the Regini and Fous cocaine in the LINT safe. He then made a false statement to Fred Hartstrom in June, 1982, that no drugs were in the safe. Meyers picked up the Vanish box from the OSP lab, and took the box to the abandoned LINT offices rather than to the secured evidence facility in Springfield. I cannot conclude that an officer of Meyers' experience and intelligence would have left $30,000 to $50,000 worth of drugs in an abandoned office, especially given his previous discussions with Hartstrom and Cope on this subject.

Safe deposit box # 130 was obviously used to store the stolen cocaine from the Regini and Fous cases.

No one else could have stolen the cocaine from the Regini and Fous cases. There is no evidence that anyone else in the LINT office possessed the cocaine from both cases after it was left with Meyers. When the counterfeit cocaine was found in the LINT safe, it was found in envelopes that were directly tied to Meyers, through the "For Prints" envelope left with Meyers and the "Fous and Lara" envelope bearing his own handwriting. Access to the safe was quite limited. Meyers' use of box # 130, his repeated false statements regarding the box, and his offer to sell drugs to Cal Canon are more than bizarre coincidences.

■ These occurrences, when viewed in their entirety, show beyond a reasonable doubt that Meyers took the cocaine from the Regini and Fous arrests and substituted the counterfeit substance. The large amount and high value of this cocaine, and Meyers' offer to sell "powder" to Canon show that Meyers intended to distribute the cocaine. Thus the evidence shows beyond a reasonable doubt that the defendant possessed approximately seventeen ounces of cocaine—the Regini cocaine—with intent to distribute. The evidence also shows beyond a reasonable doubt that the defendant possessed approximately nine ounces of cocaine—the Fous cocaine—with intent to distribute. Accordingly, I find the defendant guilty of two counts of possession of cocaine with intent to distribute.

The evidence does not show beyond a reasonable doubt that Meyers illegally possessed the marijuana, and I find him not guilty of Count 4.

Neither does the evidence show beyond a reasonable doubt that Meyers conspired with Belair to distribute the stolen cocaine, and I find him not guilty of Count 1.

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Crim.P. 23(c).

## ORDER
## ON MOTION FOR NEW TRIAL

■ On October 29, 1984, defendant Meyers moved for a new trial. Pursuant to Fed.R.Crim.P. 33, I may grant the motion if it would be in the "interest of justice" to do so. I find that this would not be in the interest of justice and DENY defendant's motion.

Defendant bases his motion on eight alleged errors in the court's opinion in this case. Only one of the alleged errors merits discussion.

My opinion indicates that Meyers took the nondrug evidence in the Fous case from the OSP lab to the Springfield evidence facility. This is incorrect. Officer Cope testified that he took the nondrug evidence to the Springfield facility on July 5, 1982, several days after LINT had disbanded.

The error is insignificant. Meyers headed the Fous investigation. He was also Cope's supervisor, and was aware that Cope had taken nondrug evidence stored in the LINT office to the Springfield evidence facility. In the last report he filed as LINT Coordinator, Meyers stated:

> The cocaine and marijuana seized [in the Fous case] were taken to the Oregon State Police Crime Detection Laboratory for analysis. The cocaine and marijuana were then lodged in the LINT office pending disposition of this case and the non-controlled substance items were lodged in the Springfield Police Department Property Locker pending disposition of this case.

Defendant's Exhibit "C" at 6–7. In an earlier discussion with Cope, Meyers had also agreed that the drugs seized in the Fous case and the other evidence in the Vanish box should be taken from the OSP lab and stored in the Springfield facility. (Tr. at 194.)

Meyers chose not to take the Vanish box from the OSP lab to the Springfield evidence facility, which was only a short distance from Eugene. Instead, he took the box to the abandoned LINT offices, where according to his story he broke open the box, retrieved the cocaine from the assortment of other exhibits, placed the cocaine in the safe, and presumably put the marijuana in a cabinet in the LINT office. I cannot conclude that an officer of Meyers' experience and ability would take this course of action. The evidence shows beyond a reasonable doubt that Meyers is guilty of Counts 2 and 3.

My opinion is amended as follows. On page 9, delete lines 21–24, and replace with the following:

facility. Instead, he stated that he took the Vanish box to the abandoned LINT offices, where he unsealed the box, retrieved the cocaine and placed it in the LINT safe, and placed the box in a cabinet in the office.

On page 16, delete lines 19–20, and replace with the following:

from the OSP lab, and took the box to the abandoned LINT offices rather than to the secured evidence facility in Springfield. I

IT IS SO ORDERED.