IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31501-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ARTURO LUNA HUERTA, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Arturo Huerta assigns numerous errors to his trial on charges for

possession of a controlled substance with intent to deliver and involving a minor in drug

dealing. The assignments of error challenge evidentiary rulings, sufficiency of evidence,

closed hearings, and prosecutorial misconduct. We agree with only one assignment error.

We rule that the trial court should have excluded as hearsay testimony of a law

enforcement detective comparing $100 bills given to a confidential informant with

currency recovered after the drug buy, when the State presented neither the banknotes nor

the photocopies. We nonetheless hold the error to be harmless. We affirm Huerta's

convictions on both charges.

## FACTS

A sting operation gave rise to this prosecution of appellant Arturo Huerta. On

May 30, 2012, Yakima Police Detective Erik Horbatko contacted a confidential informant and requested that the informant order the purchase of one ounce of methamphetamine and one pound of marijuana from Huerta. We do not know why police targeted Huerta. Horbatko wished the undercover buy to occur at the parking lot of a ubiquitous Walmart store in west Yakima. The confidential informant followed Horbatko's instructions.

On May 31, 2012, Yakima Detectives Erik Horbatko and Rafael Sanchez met with the confidential informant. Horbatko photocopied twelve $100 bills, after which he handed the bills to the informant for purchase of the drugs. Horbatko instructed the informant to drive to the Walmart store, park in the store's parking lot, call Arturo Huerta, and ask Huerta to come to the lot. Horbatko and Sanchez followed the informant into the northwest corner of the Walmart parking lot in order to observe the purchase. Drug task force members surrounded the perimeter of the parking lot.

After an hour, Detective Erik Horbatko spied a tan Honda Accord enter the Walmart parking lot and park a few rows from the confidential informant's car. Arturo Huerta and a woman companion exited the Accord, and Horbatko saw Huerta holding a red cup in his hand. The activity of the companion is relevant to charges against Huerta for involving a minor in a drug purchase. Horbatko spoke with the informant on the phone and told him to drive closer to Huerta and his companion. The informant complied, and Huerta approached the informant's car. Huerta's female companion

2

walked about one hundred fifty feet from him and stood near a shopping cart kiosk, planting strip, or a light post in the parking lot. According to Erik Horbatko, the female companion continued to survey the lot.

Arturo Huerta entered the passenger seat of the confidential informant's car. After one or two minutes, Huerta, without the red cup, exited the informant's vehicle. Detective Erik Horbatko watched Huerta and his female companion return to the Honda Accord, enter the Accord, and sit for thirty seconds. The informant drove from the parking lot, and Horbatko followed the informant. Huerta drove the Accord from the lot as undercover task force members trailed him.

Detective Erik Horbatko met the confidential informant at a parking strip near the Walmart store. The informant handed Horbatko a red McDonald's french fries cup. Horbatko removed three separate parcels of a white crystal substance and a $100 bill from the cup. Washington State Patrol Forensic Scientist Andrea Ricci later ascertained one of the parcels contained 13.8 grams of methamphetamine. Detective Horbatko compared the retained bill with the photocopy previously taken of the twelve bills. The $100 bill was one of the twelve bills that Horbatko handed the confidential informant before the parking lot purchase.

At the request of undercover drug task force members, Yakima police officers detained the Honda Accord and arrested Arturo Huerta and his companion. At the Yakima Police Department, law enforcement identified the companion as sixteen-year-

3

old Suzanna Rodriguez. Huerta and Rodriguez's families are close, and Rodriguez often socialized with Huerta's girlfriend and daughters.

At the police department, officers searched Arturo Huerta's person and found neither drugs nor money. A female police officer took Suzanna Rodriguez into a secluded room to conduct a frisk, but before the officer began the search, Rodriguez reached into her bra and removed a wad of money. The wad contained eleven $100 bills. Detective Erik Horbatko compared the eleven bills to the photocopy he ran earlier, and the detective confirmed the bills surrendered by Rodriguez matched bills given the informant to purchase drugs from Huerta.

After obtaining a warrant, Detectives Erik Horbatko and Rafael Sanchez searched the tan Honda Accord. On the floor of the passenger side front seat, the detectives found a McDonald's food bag with a ball of aluminum foil at the bottom of the bag. Inside the aluminum lay two small plastic bags of a crystal substance. A state chemist determined one of the bags contained 3.3 grams of methamphetamine. In the back seat of the Accord, the detectives retrieved another food bag containing a crystal shard and a smaller bag with the crystal substance. A state scientist concluded that the loose crystal substance consisted of 1.7 grams of methamphetamine.

## PROCEDURE

The State of Washington charged Arturo Huerta with one count of possession of methamphetamine with intent to deliver. The State later amended its information to

4

additionally charge Huerta with one count of involving a minor in drug dealing.

Before trial, Arturo Huerta moved for the disclosure of the identity of the State's confidential informant. He argued that disclosure was essential to a fair determination of his prosecution since the informant was a percipient witness to the transaction that gave rise to the criminal charges. The State opposed the motion by arguing that the confidential informant's testimony was not relevant to the charges. The State also reported that Detective Erik Horbatko could not locate the confidential informant and believed he left Washington State.

Arturo Huerta next filed a pretrial motion to dismiss. Huerta argued that the State's refusal to produce the confidential informant warranted dismissal and that the State's inability to locate the informant amounted to governmental misconduct under CrR 8.3(b). Huerta also moved in limine to exclude testimony regarding a possible romantic relationship between Huerta and Suzanna Rodriguez. He further asked for exclusion of evidence of an incident in which Rodriguez called out "I love you" to Huerta while the duo rested in jail. Clerk's Papers (CP) at 26.

The trial court entertained Arturo Huerta's motion to compel disclosure, motion to dismiss, and motions in limine at the beginning of trial. During the hearing on the motion to compel disclosure of the confidential informant's identity, Huerta and the State agreed to allow Huerta's counsel to interview the informant, without obtaining the informant's identity, and record the interview. Presumably the confidential informant reappeared,

5

assuming he ever disappeared. Huerta's attorney interviewed the confidential informant that afternoon.

During the morning following the previous afternoon's interview of the informant, Arturo Huerta's counsel informed the trial court that the State disallowed questions about the informant's relationship to Huerta or the vehicle driven by the informant the day of the parking lot rendezvous. Huerta renewed his motion to dismiss, although he limited the motion to dismissal of the charge of involving a minor in drug dealing. He contended the informant could provide testimony concerning whether Suzanna Rodriguez acted as a decoy or sentinel. He argued that the State's interference during the interview prevented him from preparing an adequate defense. Huerta provided the State and the trial court with copies of the recording of his attorney's attempted interview. The trial court and counsel discussed whether the court should interview the confidential informant in camera. The trial court never ruled that it would interview the informant, nor does the record confirm any interview. The trial court stated that it would listen to the recording of the defense's interview with the confidential informant. The court did not mention when it would listen to the recording. Shortly thereafter the trial court took a noon recess.

After the lunch recess, Arturo Huerta informed the trial court that he no longer wished to know the confidential informant's identity. The trial court did not indicate whether it listened in camera, during the noon recess, to the recording of defense

6

counsel's interview with the informant. The trial court next addressed Huerta's motions in limine. The State agreed not to offer Suzanna Rodriguez's purported "I love you" statement to Huerta unless the defense opened the door to its relevance. The prosecutor remarked:

> As to, I love you, it's not relevant unless for whatever reason the [d]efendant gets up and says something that, you know, I don't know this person, or something that would make it relevant and then we can discuss it at that time.

Report of Proceedings (RP) at 96. Thus, the trial court rendered no ruling on the motion to preclude testimony of the comment.

Jury selection proceeded the following day and ended at 4:32 p.m. The time of ending is important to a public trial challenge by Arturo Huerta.

During trial, Detective Erik Horbatko testified for the prosecution. During his testimony, Horbatko uttered comments to which Arturo Huerta objected as irrelevant and prejudicial:

> Q [PROSECUTOR]: You mentioned undercover—have you done undercover operations where you were involved?
> A [HORBATKO]: Yes.
> Q Okay. And is that dangerous?
> A Very.
> MR. CASE [DEFENSE]: Objection as to relevance.
> THE COURT: It just goes to his background, so overruled.

RP at 198-99.

> A [HORBATKO]: Before we did that, we had a[n] operational safety briefing.

7

Q [PROSECUTOR]: What's that entail?

A It's very detailed and it's safety driven, safety of all involved, including possible suspects. I have personally been involved where there have been shootings that have taken place. I have been to scenes where shootings have taken place.

. . . .

MR. CASE: Objection. Relevance.

THE COURT: Relevance?

MR. CAMP: [PROSECUTOR]: It's explaining setting up—it's explaining the setup and the plan for the operation and the things that go into the thought process of the lead detective.

MR. CASE: What has occurred in the past in other cases has no relevance on the safety meeting as to this matter.

THE COURT: Overruled. Go ahead.

RP at 201-02.

Q [PROSECUTOR]: From the start, what happened?

A [HORBATKO]: I was in contact with the confidential informant through phone and we were actually there for some time, I think a little over an hour, waiting.

Q Is that something that is expected?

A It is. We call it doper time.

MR. CASE: Objection. Prejudicial.

THE COURT: Overruled.

RP at 207.

During Detective Erik Horbatko's testimony, Arturo Huerta objected to Horbatko attesting to the use of marked bills in the drug transaction. Huerta cited both hearsay and best evidence rules in support of his objection:

A [HORBATKO] . . . I issued the confidential informant $1200 in $100 bills that I had xeroxed off.

MR. CASE [DEFENSE COUNSEL]: Objection. Not in evidence.

THE COURT: Overruled. Go ahead.

MR. CASE: Foundation.

8

THE COURT: Overruled. Go ahead.

A Twelve $100 bills that I had xeroxed and made a copy of prior to meeting with the informant.

Q And why do you xerox the buy money?

A So that at the end of the operation—in this case it was a buy bust operation, which is you buy the drugs, you arrest the suspect or suspects, whoever's involved. But sometimes strategically we don't plan things that way and we end up raiding a house or serving a search warrant, and part of that evidence is pre-recorded buy money, which we find commonly in people's homes. Even a week, two weeks after the transactions have taken place, we'll find our money in their residence.

Q Now, there was an objection. Do you usually keep the xerox photocopy of the money?

A Yes.

Q Okay. And do we have that with us today?

A We do not.

Q Okay. And do we know why?

A No, we don't. I can't blame anybody but myself. I don't know what happened to it. I know what I usually do with it.

Q What is that?

MR. CASE: Move to strike testimony regarding the xerox money and where what.

THE COURT: Do you have other—why don't we do this? Let's reserve on that issue and—

MR. CAMP: [Prosecution]: There's corroborating evidence, Your Honor.

THE COURT: Well, proceed with other testimony and then when we get close to lunch, we'll let the jury go to lunch and then we can talk about it.

RP at 205-06. During this passage, Horbatko commented that the bills were "pre-recorded," but he did not mention the bills being "marked."

Outside the presence of the jury, able defense counsel and the learned trial court engaged in a colloquy concerning Arturo Huerta's hearsay and best evidence rule objections to testimony about the buy money. The trial court overruled both hearsay and

9

objections and allowed Detective Horbatko to testify about the contents of the $100 bills

and their photocopy counterparts, provided Horbatko was the person who copied the bills

or the photocopier testified.

Erik Horbatko then testified:

> Q Detective Horbatko, just to get us back to where we were at prior to the lunch break, we were talking about the money that you had given to the confidential informant. How much money was that again?
> A One thousand 200 dollars.
> Q And we also talked about recording the bills. And again, why do you record the bills?
> A So I can verify that it's the same money later on down the road after an arrest has been made or it becomes evidence.
> Q And how do you record the money?
> A Ninety-eight point seven three percent of the time I xerox the copies. Every once in a while if it's just a few bills, I'll just write the bills down in my notes. In this particular case it was xerox copied.
> Q And do we have the xerox copy?
> A No.
> Q Okay. And why is that?
> A I don't know. I don't know where it is. I have a system and for some reason it's not with everything that I've had in this case.

RP at 236-37 (emphasis added).

Detective Erik Horbatko testified later about the McDonald's french fries cup

handed him by the confidential informant after the parking lot transaction:

> Q What was inside of the McDonald's fry box?
> A It was a bag with—no, I'll explain, but it had two eightballs and one half ounce of methamphetamine approximately. So it was three separate parcels. There was two about the size of a—an ounce is about the size of an egg and an eightball is about the size of, like, a large marble would be or like a large olive, and there were two of those with it, as well.
> Q So—

10

A Along with one $100 bill.

Q Showing you what has been marked as State's Identification Number 5. Do you recognize this?

A Yes.

Q How do you recognize it?

A This is the McDonald's Golden Arch red box that the confidential informant gave me that contained the—

MR. CASE: Objection. Foundation (inaudible).

THE COURT: Overruled. Go ahead.

Q Go ahead.

A Confidential informant gave me this and inside this was what ultimately turned out to be methamphetamine and a $100 bill.

Q And was the $100 bill—was that some of the marked bills buy money?

A Yes.

Q I'm showing you what—

MR. CASE: Objection. Move to strike.

THE COURT: Basis?

MR. CASE: Based on the Court's prior pretrial ruling regarding the buy money.

THE COURT: Why don't you just have him explain how he knew the $100 bill was part of the buy money?

Q How did you know that the $100 bill was part of the buy money?

A Before the operation I had xeroxed 12 $100 bills. I made a copy of those, I put those in my folder with my notes. I had those 12 $100 bills with me until I gave them to the confidential informant to use during the transaction and I got one back from him immediately after the transaction.

RP at 242-44. Horbatko spoke of the bills being marked, but did not identify the nature of the markings. He did not disclose whether he or another law enforcement officer placed a mark on the bills.

Erik Horbatko testified concerning money found on Suzanna Rodriguez:

Q And was the Defendant searched for drugs and money—Arturo?

A Yes, I assume. I did not do that.

Q Was the buy money found?

11

A  No.

Q  Since there was no buy money, what did you think?

A  I thought it has to be in—my first thought was, it has to be in the vehicle.  The only other place it could be is the female, the juvenile female.

Q  And did you check the possibility that it might be on the juvenile female?

A  I did after—at that time I wasn't able to search the vehicle because it was pending a search warrant, I couldn't search it without one. So I had a female officer—Officer Taryn Miller—she actually happened to walk in our patrol room as I was going to have her, Suzana, searched, and she agreed.  I don't know where she took her.  I don't know if it was a rest room or I don't think it was in the juvenile holding cell because it has cameras.  So maybe 20, 30 seconds later Officer Miller came to me with 11 $100 bills and said that the money was found in—

MR. CASE:  Objection.  Hearsay.

DETECTIVE HORBATKO:  Okay, you're right.

THE COURT:  Sustained.

Q  So did Taryn Miller hand you over—

A  Eleven hundred dollars.

Q  Okay.  And did you check—did you reference—or how about this—was it the buy money?

A  Yes.

Q  Okay.

MR. CASE:  Objection.

Q  Every single bill?

THE COURT:  Wait, wait.  Objection is foundation?  Why don't you ask him how he knew it was the—

Q  Did you—how did you know that it was the buy money?

A  I compared it with the xerox copy that I had done prior to the operation and it matched.

Q  And why do you keep the xerox copy—what happens to the buy money after it's been utilized—does it go into evidence?

A  No, it doesn't.

Q  Why is that?

A  Because we need it basically to buy drugs for another day, so we put it back into our fund in the safe to use later on.

RP at 250-02.  In this passage, Detective Horbatko spoke of comparing the bills taken

12

from Rodriguez as matching the photocopied bills. He did not identify the markings or content within the bills that allowed the comparison. Horbatko, at no time during any of his testimony, mentioned the presence of serial numbers on the $100 bills.

During cross-examination of Detective Erik Horbatko, the following exchange occurred between defense counsel and Horbatko:

> Q All right. You talked about the situation involving the 1991 Honda. Now, it is—it is in your prior experience that drug dealers might have cars that are expensive and shiny and fancy; that's correct, isn't it?
> A Yes, sometimes.
> Q Okay. And often you guys go after the assets that aren't involved in the exact transaction itself; right?
> A Sometimes.
> Q For instance, if you feel that the individual had more assets than what occurred at the transaction, you could go to their house and try and seize their car or their property inside their house; correct?
> A Yes.
> Q And there was no such actions here with regards to Mr. Huerta; is that correct?
> A I didn't know where he lived. This was a one-time shot, a one-time deal. I didn't know anything else about him.
> Q Interesting. And so, following up on that investigation, you weren't able to find any assets as to his home for additional cars or other assets or monies or savings that he has; is that correct?
> A No. I didn't find anything. I didn't know anything else about him and *he wouldn't talk to the police*.

RP at 350-51 (emphasis added). On appeal, Arturo Huerta complains that Horbatko's last answer violated his right to remain silent.

Court proceedings concluded at 4:42 p.m. on the first day of Erik Horbatko's testimony. The day following court proceedings ended at 4:21 p.m.

13

After the State rested its case, Arturo Huerta again moved to dismiss the charges

against him, citing insufficient evidence. The trial court reserved its ruling on the

motion. Suzanna Rodriguez testified for the defense and stated that she needed a ride

from Huerta to Walmart to purchase pads. Rodriguez' father asked Huerta to provide the

ride since the Rodriguez family car was inoperable. She also declared that, upon arriving

at Walmart, she entered the store, bought pads, returned outside, and sat in the car while

waiting for Huerta. Huerta gave her no directions. Rodriguez, nevertheless, admitted

that the Walmart store where she purportedly shopped that day lay eighty-four blocks

from her house and other stores, including a ubiquitous Walmart, were closer to her

residence.

During cross-examination by the prosecution, Suzanna Rodriguez testified that she

did not want Arturo Huerta to be in trouble. Thereafter, the following colloquy occurred

between the State's counsel and Rodriguez:

> Q Okay. And—and you care about him, don't you?
> A Well, not like that, no.
> Q Not like that. Well, isn't it true that when you found out what
> was going—isn't it true at the Yakima Police Department that when you
> found out that you might possibly be in some trouble and Arturo was in
> trouble—
> A Yeah.
> Q —that you started crying; isn't that correct?
> A Yeah.
> Q And didn't you yell out to him I love you?
> A Yeah.
> Q Okay. And didn't he return and say I love you?
> A Yeah. To like—like family.

14

> MR. CASE: Objection.
> Q Like family?
> MR. CASE: Hearsay.
> THE COURT: Overruled.
> MR. CAMP: Party opponent, Your Honor.
> Q So you found out he might get in trouble and you yelled out that you loved him. Wouldn't you be kind of angry to a certain extent that you were getting in all this trouble for something he possibly did?
> A I guess.

RP at 451-52.

Also during cross-examination, Suzanna Rodriguez admitted that she had $1100 tucked in her bra. On redirect, Rodriguez testified she did not know why she received the money. Arturo Huerta and she had no romantic relationship.

Arturo Huerta did not testify at trial. After the defense rested its case, the trial court denied Huerta's motion to dismiss.

On appeal, Arturo Huerta contends the State of Washington expanded the charges against him by new theories during its summation. During closing argument, the State of Washington maintained:

> Ladies and gentlemen, there was the methamphetamine in the car and there was also this methamphetamine in the fry box, in the red fry box. Ladies and gentlemen, he didn't constructively possess this methamphetamine, he actually possessed this methamphetamine. When he walked from his car to the confidential informant's car, he had the intent to deliver it. And when he got out, he didn't have it anymore.
>     . . . .
> And what else? Right. He just got done selling meth that was packaged the same way, bagged in the same manner, and disguised in the same manner. All right. Ladies and gentlemen, he just sold the fries—I submit to you it's reasonable to infer that he was about ready to sell the

15

burger. Thinking, what do they say, uh, two patties, special sauce, lettuce, cheese, pickles, onions on a sesame seed bun, and meth. That there shows the intent.

So the State would submit to you that the evidence before you, circumstantial evidence and direct evidence, points that the [d]efendant intended to sell the methamphetamine in the car, and he intended to sell or deliver the methamphetamine in his hand as he was walking towards the vehicle.

RP at 496-98. During closing, the prosecution never mentioned Detective Erik Horbatko's matching the retrieved $100 bills with the photocopied bills.

During summations, the State also commented concerning the charge of involving a minor in a drug transaction:

Now, it also says allowing a person under the age of 18 to remain at a drug transaction is insufficient to establish that a person under the age of 18 is involved in a drug transaction. Now, note that there's nothing about criminal intent for the minor. What the minor knows or doesn't know doesn't matter. It's all directed at the actions of the adult.

. . . .

Well, let's see what we have here. Well, he took her there. He drove her to the drug deal. Two, they both exited the vehicle and they both were looking around.

Now, either they were looking for the confidential informant's vehicle or they were doing a heat check or looking for the police, or both.

What she did was she walked a short distance away from the vehicle and started looking around. And then when the transaction was done and he got out, she walked right back with him, got into the vehicle and they left.

She acted as a lookout. She was countersurveillance, which the detective—Detective Horbatko stated happens all the time. All right. She was the lookout. She was Uncle Tury's (phonetic) little helper is what she was. All right. Doesn't matter why. Doesn't matter had – her criminal intent or if she knew anything, but she was helping him with countersurveillance.

. . . .

16

He took her there to be a lookout, to hold the money, to be a decoy. Where were the drugs found? On her side between her legs. Cute little 16-year-old driving with Uncle Tury. Anything goes down, they're not going to search her. They're going to think, oh, he's just being a—maybe he's her father, not a drug dealer. Decoy—avoid, apprehension, detention—that was her job. She had failed at it. They were done. She was distraught about that because she cared about him. That's where the tracks lead.

. . . .

Well, ladies and gentlemen, he's not charged with delivery. He's charged, as it says in there, involving her in a transaction to—to unlawfully deliver meth. Right? It doesn't say in a transaction that results in an actual delivery.

RP at 500, 503-05, 538-39.

The jury declared Arturo Huerta guilty of possession of a controlled substance with intent to deliver and involving a minor in drug dealing. After the jury delivered its verdict, the trial court judge spoke with the jury off the record. During a later sentencing hearing, the trial court disclosed the contents of its conversation with the jury regarding the charge of involving a minor in drug dealing:

THE COURT: Okay. So, again, the mere fact that he has been convicted of this crime—again, I can't imagine any fact situation where—I mean if the facts had been any less, it probably wouldn't have gotten to the jury on Count II. In fact, I talked to the jury afterwards. Did you talk to the jury?

MR. CAMP: I did, Your Honor.

THE COURT: They told me they didn't think she was a lookout and that they don't think he gave her the money until the cops pulled them over in the Nob Hill parking lot at the bowling alley. Well, that's—you know, that's pretty far removed from the transaction. Now, whether this is going to hold up on appeal or not, I don't know. But again it's hard to imagine how you could have a set of circumstances where there was still enough to convict somebody but that would be less than what there is in this case. I mean this is a really close case.

17

RP at 563.

Thereafter Arturo Huerta renewed his motion to dismiss the charge of involving a minor in drug dealing on the basis of insufficient evidence. The trial court denied the motion. The trial court convicted Huerta on both counts, sentenced him to sixteen months' confinement on the charge of possession with intent to deliver, and sentenced him to fifty-one months' confinement on the charge of involving a minor in drug dealing, with the sentences to be served concurrently.

After Arturo Huerta appealed, this court requested a reference hearing be conducted in another case, *State v. Andy*, No. 31018-3-III, for findings regarding public access to the Yakima County courthouse and its courtrooms during Joey Andy's trial. Andy expressed concern that the public lacked access to his trial because of a courthouse sign stating the courthouse closed at 4 p.m., when his trial often continued beyond that closing time.

Yakima County Commissioner Rand Elliott, Court Administrator Harold Delia, and courthouse Security Officer Joel Clifford testified at the *Andy* reference hearing. After the hearing, Yakima County Superior Court Judge Blaine Gibson entered factual findings, the most pertinent of which are: (1) a sign on the exterior of the county courthouse informed the public that the courthouse closed at 4 p.m. and the court at 5 p.m., (2) despite this sign, no member of the public was deterred from attempting to enter

the courthouse, (3) during Andy's trial, Yakima County maintained a policy that the doors would remain unlocked as long as any courtroom remained in session, and (4) court security personnel would verify that all court sessions had ended before locking the courthouse doors.

At this reviewing court's request, Yakima County Judge Blaine Gibson held another reference hearing in *State v. Arredondo*, No. 30411-6-III, on the same issue. The trial judge found: (1) courthouse doors remained unlocked during Fabian Arredondo's trial, and (2) courthouse signage did not deter or deprive the public of accessing the proceedings. Our court commissioner later granted an agreed motion to supplement the record with the transcripts and exhibits from the reference hearings held in *State v. Andy* and *State v. Arrendondo*. Commissioner's Ruling, *State v. Huerta*, No. 31501-1-III (Wash. Ct. App. Mar. 26, 2014).

## LAW AND ANALYSIS

Arturo Huerta raises many contentions on appeal: (1) the trial court deprived him of his right to an open and public trial by listening to a recorded informant interview in camera without conducting a *Bone-Club* analysis, (2) the trial court deprived him of his right to an open and public trial by holding proceedings after 4 p.m., (3) the trial court admitted evidence that violated hearsay and best evidence rules, (4) his conviction for possession with intent to deliver is not supported by sufficient evidence, (5) his conviction for involving a minor in drug dealing is not supported by sufficient evidence,

19

(6) the State committed prosecutorial misconduct by eliciting testimony from Detective Horbatko designed to inflame the jury, (7) the prosecutor misstated the charges against Huerta during closing argument, and (8) cumulative error requires reversal. We address these assignments of error and more in such order. The many assignments of error prolong this opinion.

*Issue 1: Whether the trial court denied Arturo Huerta of his right to an open and public trial when listening to a recorded interview of the confidential informant?*

*Answer 1: No.*

We first address Arturo Huerta's contention that two trial incidents violated his public trial rights. If he succeeds on either argument, we would reverse the convictions and remand for a new trial. Such a reversal would moot other assignments of error.

Arturo Huerta maintains that the trial court deprived him of his right to an open and public trial in two instances: (1) by listening to a recorded defense interview with the confidential informant in camera, during a recess, and without conducting an analysis under *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995), and (2) by holding court proceedings after 4 p.m., when courthouse exterior signage informed visitors that the courthouse was closed to the public at that hour. We address the contentions in such order.

Arturo Huerta contends the trial court violated his right to a public trial when it stated on the record that it would listen in camera to Huerta's counsel's recorded

interview with the State's confidential informant, without first conducting a *Bone-Club* analysis. In other words, a part of the proceedings would occur with the judge alone in his chambers and not be open to the public. We refuse to address this argument because the record does not confirm that the trial court listened to the recording. Shortly after the court commented that it would listen to the recording, the court recessed for lunch. On appeal, Arturo Huerta claims that the trial court remarked that it would listen to the recording during lunch, but the record is void of any such comment. When court proceedings resumed after lunch, Arturo Huerta withdrew his request to call the confidential informant as a witness. Therefore, the trial court no longer possessed a reason to listen to the recording. The trial court never stated on the record that it listened to the recording during the noon recess.

As former practitioners, we recognize the diligence of superior court judges who frequently use the noon hour to review pleadings and depositions related to a pending trial. We do not know if this practice occurs so frequently that we could take judicial notice of Arturo Huerta's trial court judge listening to the interview recording during the lunch hour. Assuming the trial court judge devoted his lunch hour to work, he could have read other critical pleadings or case law for Huerta's trial.

Article I, section 10 of the Washington Constitution reads, "Justice in all cases shall be administered openly, and without unnecessary delay." This provision entitles the public and the press, as representatives of the public, to openly administered justice.

21

*Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 209-10, 848 P.2d 125 (1993); *Cohen v. Everett City Council*, 85 Wn.2d 385, 388, 535 P.2d 801 (1975). Article I, section 22 of the Washington Constitution provides, in pertinent part, "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial." In *State v. Bone-Club*, 128 Wn.2d 254 (1995), our state high court enumerated five criteria that a trial court must consider on the record in order to close trial proceedings to the public. Huerta need not have objected at trial to a constitutional violation in order to raise this issue for the first time on appeal. *State v. Shearer*, 181 Wn.2d 564, 569, 334 P.3d 1078 (2014).

A defendant does not establish a violation of the public trial right unless he shows a closure of the courtroom. *State v. Gomez*, 183 Wn.2d 29, 33, 347 P.3d 876 (2015). The defendant bears the burden of providing a record that shows a courtroom closure occurred. *State v. Andy*, 182 Wn.2d 294, 301, 340 P.3d 840 (2014); *State v. Koss*, 181 Wn.2d 493, 503, 334 P.3d 1042 (2014). Assuming a trial judge's listening in chambers to a recorded deposition constitutes a closure, Arturo Huerta has not shown the court closure occurred.

*State v. Gomez*, 183 Wn.2d 29 (2015) is illustrative. The trial court commented at the beginning of trial that the public would not be permitted to enter the courtroom once the proceedings began for security reasons and to prevent distractions. The Supreme Court held that the trial court's comments did not sustain Benito Gomez's assertion that

22

his public trial rights were violated. The record contained no indication as to whether the court took any action to enforce the policy or whether any observers were actually excluded as a result of the remark.

*Issue 2: Whether the State violated Arturo Huerta's right to an open and public trial because of an exterior courthouse sign that read the courthouse closed at 4 p.m. and trial proceedings continued beyond that time?*

*Answer 2: No. A reference hearing established the courthouse remained open.*

Arturo Huerta next complains about trial proceedings extending beyond 4 p.m. Huerta maintains that at the time of his trial, Yakima County courthouse's exterior signs, website, and telephone system informed the public that the courthouse closed at 4 p.m. and these announcements deterred the public from viewing his trial. Huerta identifies no evidence in the record of these facts, but rather argues that the public knows Yakima County to administer its courthouse in this manner. The State relies on the trial court's findings in the reference hearings for *State v. Andy* and *State v. Arredondo* to argue that no closure took place during Huerta's trial. We agree with the State.

The Washington Supreme Court addressed Arturo Huerta's contention in its own review of Joey Andy's case. *State v. Andy*, 182 Wn.2d 294 (2014). The court noted that a defendant bears the burden of providing a record that shows a courtroom closure occurred. The Supreme Court held no closure occurred in Andy's case because of the findings made by the trial court judge during the reference hearing.

23

We have ordered no reference hearing in this appeal, and thus we lack any finding by the trial court as to whether the courtroom signage discouraged a member of the public from attending Arturo Huerta's trial or if officials locked the courthouse doors during the proceedings. At the same time, Huerta forwards no evidence in the record of the purported offending closure sign or of locked courthouse doors. The parties stipulated to this court considering the reports of proceedings in *State v. Andy* and *State v. Arredondo*. In those hearings, the trial court found that the public could access the courthouse when any court was in session. Based on the trial court's findings in *Andy* and Huerta's lack of any affirmative evidence, we hold that Huerta has not met his burden to show that a courtroom closure occurred. Thus, we rule Arturo Huerta suffered no violation of his public trial rights.

*Issue 3: Was testimony of Erik Horbatko that the bills recovered after the methamphetamine purchase matched the previously photocopied bills inadmissible hearsay?*

*Answer 3: Yes.*

Sometimes an undercover law enforcement pens a peculiar marking on currency used in a sting's purchase of narcotics or stolen property. In the case on appeal, the State of Washington refers to the banknotes paid by the confidential informant to Arturo Huerta for the purchase of the methamphetamine alternatively as "marked" and "prerecorded." Nevertheless, Detective Erik Horbatko did not disclose if he or another

24

officer marked the $100 bills. Rather than marking the currency, law enforcement officers usually photocopy drug buy money for the ease of creating a record of the serial numbers of the bill. The serial number of each banknote is unique and thus each note is easily traceable. In addition to identifying the particular bill, serial numbers can divulge other information such as the banknote's year of issue, place of printing, whether it is part of a collector series, and whether it replaced a defective note. For purposes of our hearsay analysis, we assume that, since he photocopied the currency, Detective Horbatko matched serial numbers rather than other markings on the bills when comparing the buy money with the $100 bills later recovered. Our analysis would not change if Horbatko otherwise marked the currency.

Arturo Huerta shrewdly objected to Detective Erik Horbatko's testimony concerning the prerecorded $100 bills on both hearsay and best evidence grounds, but the trial court overruled both objections. Huerta renews the objections on appeal. We address the hearsay objection first.

Detective Erik Horbatko testified that he matched the copy of purchase money handed to the confidential informant with the money later pulled from Suzanna Rodriguez's undergarment and the red french fries cup. This testimony necessarily relied on the contents of the $100 bills. Money talks. The serial numbers on the bills spoke to Horbatko of their true identity and Horbatko, when later testifying, relied on the banknotes' out of court statement of their identity. Thus, Horbatko's testimony was

25

either hearsay or based on hearsay.

This court reviews whether or not a statement was hearsay de novo. *State v. Neal*, 144 Wn.2d 600, 607, 30 P.3d 1255 (2001). "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." ER 801(a). Whether a statement is hearsay depends on the purpose for which the statement is offered. *State v. Garcia*, 179 Wn.2d 828, 845, 318 P.3d 266 (2014); *State v. King*, 113 Wn. App. 243, 267, n.4, 54 P.3d 1218 (2002). Statements not offered to prove the truth of the matter asserted, but rather as a basis for inferring something else, are not hearsay. *State v. Garcia*, 179 Wn.2d at 845. As confirmed by the text of ER 801(a), the content of or information from writings may constitute hearsay. *Palin v. Gen. Const. Co.*, 47 Wn.2d 246, 254, 287 P.2d 325 (1955).

A controlling decision is *State v. Fricks*, 91 Wn.2d 391, 397, 588 P.2d 1328 (1979). John Fricks successfully appealed the trial court's admission of a gas station owner's testimony regarding the contents of a currency tally sheet not produced at trial. The State gave no reason for the document's absence and instead presented the owner's testimony as the sole evidence of the amount of money Fricks allegedly stole from the gas station. The State relied on this testimony and evidence of a similar amount of currency found in Fricks' apartment to create an inference that the money found there

26

was in fact stolen. In holding that the tally sheet was hearsay and did not qualify for the business records exception to hearsay, the Supreme Court ruled that the owner's testimony was likewise inadmissible hearsay.

Many foreign cases support a conclusion that testimony reciting a serial number or matching serial numbers is hearsay, although in some cases the testimony was admitted under a hearsay rule exception. The State, in this appeal, has asserted no hearsay rule exception.

In *United States v. Davis*, 542 F.2d 743 (8th Cir. 1976), the government prosecuted Larry Davis for armed bank robbery. Through the bank auditor's testimony, the court admitted into evidence a list of serial numbers on stolen bait money. The court of appeals noted the evidence was hearsay but sustained its admission on the basis of the business record exception to the hearsay rule.

*People v. Rivas*, 302 Ill. App. 3d 421, 707 N.E.2d 159, 236 Ill Dec. 314 (1998) does not directly address whether a police sheet containing information concerning prerecorded funds used to buy cocaine is hearsay. The court affirmed the sheet's admission as an exhibit because of its trustworthiness as a business record. Of course, the State of Washington lacked any sheet in the prosecution of Arturo Huerta.

In another Illinois decision, *People v. Strother*, 53 Ill.2d 95, 290 N.E.2d 201 (1972), the reviewing court also addressed the admissibility of a list of serial numbers of currency used in the purchase of narcotics. The court noted that the list may be hearsay

27

because the People introduced it to prove the serial numbers recorded were in fact those of the currency used in the controlled purchase. The court approved its admission, however, on the basis of the past recollection recorded exception to the hearsay rule.

In *Kuczaj v. State*, 848 S.W.2d 284 (Tex. Ct. App. 1993), the reviewing court ruled that a list of serial numbers from stolen appliances was hearsay. The court concluded the trial court committed no error because the owner of the appliances when testifying could refer to the written list as recorded recollection.

In *State v. Griffin*, 438 A.2d 1283 (Me. 1982), the Maine high court reversed Peter Griffin's conviction for receiving a stolen outboard motor. The evidence convicting Griffin included testimony from a detective and a purchaser of the motor about matching serial numbers on the motor. According to the court, the testimony was either hearsay or based on hearsay. In *Estes v. Commonwealth*, 8 Va. App. 520, 382 S.E.2d 491 (1989), the reviewing court also reversed a criminal conviction because of hearsay testimony regarding the serial number on a stolen firearm.

Our trial court posited a thoughtful analogy about a pair of jeans with a particular mark worn by a suspect. A witness could identify the pants as that worn by the suspect based on the pants' marking. The analogy falls short, however. The jeans' mark was likely not intended to communicate any statement. The serial number of a bill or a police's marking on the bill communicates a message of identity.

The trial court also mentioned a photocopy not being a witness and the inability

28

and lack of a right to cross-examine a piece of paper. We agree, but this observation fails to recognize the missing nature of the photocopies and banknotes paid to Arturo Huerta. Consistent with the trial court's comment, the State had the right to present the bills and photocopy as exhibits to show the jury the identical markings or numbers. Horbatko could have referred to the bills or photocopy to refresh his memory. Nevertheless, the State lost the writings and desired Erik Horbatko to rely on language from the writings when that language lay outside of the courtroom.

The State contends that no error occurred since it did not offer Detective Erik Horbatko's testimony to prove the serial numbers themselves. According to the State, Horbatko's testimony was permissible to show that the numbers on the banknotes matched a list of the numbers on the currency issued to the confidential informant. Horbatko did not repeat the serial numbers in court. He only testified to the match.

The State fails to recognize that Erik Horbatko's declaration that the numbers matched can be truthful and helpful only because of the serial numbers themselves. The State offered Horbatko's testimony to show the truthfulness of the information provided in the $100 bills. Horbatko could have limited his testimony to the amount of money handed the confidential informant and the amount retrieved from the juvenile and fries cup. Horbatko went further and claimed that information on the banknotes confirmed their use in the parking lot transaction.

The State seeks to distinguish this appeal from reported decisions on the ground

29

that Detective Erik Horbatko did not tell the jury the serial numbers of the $100 bills. He merely testified that the numbers on the retrieved bills matched the numbers on the currency handed to the confidential informant. This is a distinction without a difference. Horbatko's testimony of matching serial numbers relied on the identifying numbers. Horbatko lacked a foundation for his testimony but for the hearsay.

*State v. Johnson*, 61 Wn. App. 539, 811 P.2d 687 (1991) refutes the State's position. In *Johnson*, a police lieutenant did not testify to the contents of an informant's statement, but the trial court allowed testimony, based on the statement, that he had reason to suspect the appellant was involved in drug trafficking. This court held that a law enforcement officer's testimony concerning an informant's or eyewitness's statement is inadmissible hearsay even when the officer does not repeat the contents of the statement. The *Johnson* court held that when the inescapable inference from the testimony is that a nontestifying witness has furnished the police with evidence of the defendant's guilt, the testimony is hearsay, notwithstanding that the actual statements made by the nontestifying witness are not repeated. The inescapable conclusion from Erik Horbatko's testimony and the inference the State wanted the jury to draw was based on the hearsay in the banknotes. The currency constituted a nontestifying witness.

The hearsay rule serves to prevent the jury from hearing a declarant's statement without giving the opposing party a chance to challenge the truthfulness of the declarant's assertions. *Brundridge v. Fluor Fed. Servs., Inc.*, 164 Wn.2d 432, 451-52,

30

191 P.3d 879 (2008). That purpose is served when the court bars a witness from relating the contents of a lost writing. The opponent has no opportunity to review the record or cross-examine the witness to determine the accuracy of the testimony.

*Issue 4: Whether the testimony of Detective Erik Horbatko violated the best evidence rule?*

*Answer 4: We need not and do not address this issue.*

We have already ruled that the testimony of Detective Erik Horbatko violated the hearsay rule and should not have been admitted at trial. Arturo Huerta also challenges the admissibility of the testimony about matching serial numbers as violative of the best evidence rule. Nevertheless, any ruling by us that the best evidence rule also barred the testimony would not assist Huerta. Twice barred evidence is no more or less inadmissible or harmful than once barred evidence.

We decline to resolve Arturo Huerta's challenge under the best evidence rule because its resolution does not impact our decision on the merits. Principles of judicial restraint dictate that if resolution of another issue effectively disposes of a case, we should resolve the case on that basis without reaching the first issue. *Wash. State Farm Bureau Fed'n v. Gregoire*, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007); *Hayden v. Mut. of Enumclaw Ins. Co.*, 141 Wn.2d 55, 68, 1 P.3d 1167 (2000).

*Issue 5: Whether the hearsay testimony of Erik Horbatko violated Arturo Huerta's constitutional right to confront witnesses?*

31

*Answer 5: We need not and do not address this issue.*

Arturo Huerta argues that, in addition to violating the hearsay rule, the testimony of Detective Erik Horbatko violated the constitutional confrontation clause. Under the Sixth Amendment's confrontation clause, in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. U.S. CONST. amend. VI. Even hearsay with an applicable exception becomes inadmissible in violation of the clause if it is testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

Arturo Huerta raises a constitutional violation in order to obtain a stricter harmless error review. On the one hand, erroneous evidentiary rulings that do not impact a constitutional right are not reversible error unless, within reasonable probabilities, the outcome of the trial would have been materially affected if the error had not occurred. *State v. Brown*, 113 Wn.2d 520, 554, 782 P.2d 1013, 787 P.2d 906 (1989). On the other hand, a constitutional error is harmless only if the appellate court is assured beyond a reasonable doubt that the jury verdict is unattributable to the error. *State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011).

Our review of the evidence shows that, under either harmless error analysis, the State prevails. Therefore, we will assume, without deciding, that the inadmissible evidence violated the confrontation clause.

*Issue 6: Whether the inadmissible testimony of Detective Erik Horbatko*

32

*constitutes harmless error?*

 *Answer 6: Yes.*

 The State contends that, assuming any evidentiary error infringed Arturo Huerta's constitutional rights, the error was harmless. We agree.

 A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict is unattributable to the error. *State v. Anderson*, 171 Wn.2d at 770 (2011). This court employs the "overwhelming untainted evidence" test and looks to the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *Anderson*, 171 Wn.2d at 770 (internal quotation marks omitted). We assume constitutional error to be prejudicial, and the State bears the burden of proving that the error was harmless. *State v. Watt*, 160 Wn.2d 626, 635, 160 P.3d 640 (2007).

 In analyzing harmless error, we exclude the inadmissible testimony of Detective Erik Horbatko that the serial numbers on the currency given to the confidential informant matched the numbers on the $100 bills recovered from Suzanna Rodriguez and the french fries cup. The jury still heard that $1200 was given to the informant in $100 bill denominations. Police searched the confidential informant before and after the parking lot rendezvous and the informant possessed no other currency during the time. The officers observed the transaction from beginning to end and testified that no party was out of sight from the handing of the banknotes to the informant until the arrest of Arturo

33

Huerta. Law enforcement observed Huerta bring a red cup to the parking lot. After the informant and Huerta were alone in the car, the informant delivered to police the red cup that contained methamphetamine. Law enforcement recovered twelve $100 bills after the sale. Arturo Huerta's witness, Suzanna Rodriguez, agreed she was given eleven $100 bills, which she stashed in her undergarment. Methamphetamine was found elsewhere in Huerta's Honda Accord. The State did not emphasize the matching serial numbers during closing.

Under RCW 69.50.401 and a companion federal statute, 21 U.S.C. § 841(a)(1), the State need not prove a sale of a drug, only an intent to transfer drugs from one person to another. *United States v. Ramirez*, 608 F.2d 1261, 1264 (9th Cir. 1979); *United States v. Meyers*, 601 F. Supp. 1072, 1074 (D. Or. 1984). Thus, whether or not the confidential informant purchased the methamphetamine holds little consequence. The untainted evidence overwhelming supports a finding that Arturo Huerta intended to transfer a controlled substance. The matching of the bills bore little relevance to the charge of involving a minor in a drug transaction. The untainted evidence also overwhelmingly supports this second conviction.

*Issue 7: Whether sufficient evidence supports the conviction for possession of a controlled substance with intent to deliver?*

*Answer 7: Yes.*

Arturo Huerta contends that neither of his convictions is supported by sufficient

34

evidence. Huerta argues that the methamphetamine found in the car he drove and evidence that he delivered a controlled substance to another person before his arrest is insufficient to sustain a conviction for possession with intent to deliver. Our previous harmless error analysis shows otherwise, but we independently review this assignment of error.

Due process requires the State to prove, beyond a reasonable doubt, every element of the crime charged. *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). Evidence is sufficient if, after viewing it in the light most favorable to the State, a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221-22, 616 P.2d 628 (1980); *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). A defendant challenging the sufficiency of the evidence at trial admits the truth of the State's evidence and all reasonable inferences therefrom. *Witherspoon*, 180 Wn.2d at 883. Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court may not consider, however, inadmissible hearsay when determining whether the trial testimony is sufficient for a conviction. *State v. Nation*, 110 Wn. App. 651, 666, 41 P.3d 1204 (2002).

Only the trier of fact weighs the evidence and judges the credibility of witnesses. *State v. Carver*, 113 Wn.2d 591, 781 P/2d 1308, 789 P.2d 306 (1989). A jury may draw inferences from evidence so long as those inferences are rationally related to the proven

facts. *State v. Jackson*, 112 Wn.2d 867, 875, 774 P.2d 1211 (1989). A rational connection must exist between the initial fact proven and the further fact presumed. *Jackson*, 112 Wn.2d at 875. The jury may infer from one fact the existence of another essential to guilt, if reason and experience support the inference. *Tot v. United States*, 319 U.S. 463, 467, 63 S. Ct. 1241, 87 L. Ed. 1519 (1943).

RCW 69.50.401(1) provides:

> Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance.

In order to obtain a conviction for possession of a controlled substance with intent to deliver, the State must prove the following elements beyond a reasonable doubt: (1) unlawful possession of (2) a controlled substance with (3) intent to deliver. *State v. Goodman*, 150 Wn.2d 774, 782, 83 P.3d 410 (2004). Naked possession of a controlled substance is generally insufficient to establish an inference of an intent to deliver. *State v. Darden*, 145 Wn.2d 612, 624, 41 P.3d 1189 (2002). This is true even if the amount of the controlled substance is greater than what is consistent with personal use, or if the substance is separated into individual baggies. *State v. Zunker*, 112 Wn. App. 130, 135, 48 P.3d 344 (2002); *State v. Kovac*, 50 Wn. App. 117, 121, 747 P.2d 484 (1987). Some additional factor must be present. *Zunker*, 112 Wn. App. at 136. Additional factors can include large amounts of cash, scales, cell phones, address books, baggies, and materials used in narcotics manufacture. *Zunker*, 112 Wn. App. at 136; *Goodman*, 150 Wn.2d at

36

783. A rule controlling in this appeal is that a jury may infer possession with intent to deliver a controlled substance from evidence that a defendant delivered a controlled substance to another person shortly before his arrest. *State v. Hernandez*, 85 Wn. App. 672, 676, 935 P.2d 623 (1997); *State v. Brown*, 68 Wn. App. 480, 484, 843 P.2d 1098 (1993).

In *State v. Hernandez*, 85 Wn. App. at 675, a consolidated appeal, two individuals challenged the sufficiency of the evidence for their convictions for delivery of a controlled substance. In each case, police officers used high power binoculars to observe the individuals allegedly delivering drugs, arrested the individuals after the customers had left with the merchandise, and found illicit drugs on the arrestees' persons that appeared similar to the item delivered. In upholding the convictions for delivery of a controlled substance, this court analogized approvingly to federal decisions holding that a factfinder could reasonably infer possession with intent to deliver based on evidence that the person delivered a controlled substance prior to their arrest.

Sufficient evidence supports Arturo Huerta's conviction for possession of methamphetamine with intent to deliver. Law enforcement personnel instructed their confidential informant to call Huerta and arrange to purchase marijuana and methamphetamine. The officers observed Huerta enter the Walmart parking lot, carry a red cup, enter the informant's vehicle, and shortly after exit the vehicle without the cup. Detective Horbatko searched the informant immediately after the sale and discovered that

37

the red fries cup held three small bags containing methamphetamine. After Huerta's

arrest, police officers discovered more bags of methamphetamine in his car. Thus, the

State's evidence showed not only possession, but the additional factor of evidence of a

contemporaneous delivery prior to Huerta's arrest and a large amount of money.

*Issue 8: Whether sufficient evidence supports the conviction for involving a minor*
*in a drug dealing?*

*Answer 8: Yes.*

Arturo Huerta also contends that insufficient evidence supports his second

conviction for involving a minor. He contends that Suzanna Rodriguez accompanying

him to the drug buy, standing one hundred fifty feet away, looking around, and

possessing buy money after the transaction is insufficient for a jury to find him guilty of

involving a minor in a drug transaction beyond a reasonable doubt. Huerta maintains that

a child's proximity to the transaction is not encompassed within the crime as

contemplated by the statute. We agree that proximity to the transaction alone does not

establish the crime. We disagree with Huerta's argument of insufficient evidence,

however. The jury heard evidence beyond Suzanna Rodriguez's propinquity to the

delivery.

RCW 69.50.4015(1) declares:

> It is unlawful to compensate, threaten, solicit, or in any other manner
> involve a person under the age of eighteen years in a transaction unlawfully
> to manufacture, sell, or deliver a controlled substance.

38

Simply allowing a minor to be present during a drug transaction is not enough to support

a conviction. The statute requires evidence that the defendant committed some act,

directed at the minor, to bring or attempt to bring the minor into the transaction. *State v.*

*Gonzales Flores*, 164 Wn.2d 1, 24, 186 P.3d 1038 (2008). Thus, the focus is on the

defendant's affirmative acts. *State v. Hollis*, 93 Wn. App. 804, 812, 970 P.2d 813 (1999).

In *State v. Hollis*, 93 Wn. App. 804, a consolidated case, Mark Hollis and

Lawrence Reddick challenged a former version of the minor involvement statute, RCW

69.50.401(f), as unconstitutionally vague. In Hollis' case, an undercover police officer

approached Hollis and asked for "a forty." Hollis contacted Tanisha Brown, a minor, and

asked her to sell to the officer. Brown approached another minor, took pieces of rock

cocaine out of the minor's jacket, and handed the pieces to the officer in exchange for

payment. Reddick sold an undercover police officer rock cocaine while he stood arm-in-

arm with Katie Davis, a minor. Juries respectively convicted Hollis and Reddick of

involving a minor in a drug transaction. In holding that the statute was not

unconstitutionally vague as to the particular facts of their cases, this court explained:

> An ordinary person should understand that Hollis' actions of asking
> and convincing Brown—who was a minor—to unlawfully sell cocaine to
> Officer Fox are proscribed by this statute. Likewise, an ordinary person
> should understand that Reddick's acts of approaching the drug transaction
> arm-in-arm with a minor, Davis, and allowing that minor to remain present
> during the drug transaction, thereby obliging her to become associated with
> the drug transaction, are also proscribed under this statute.

*Hollis*, 93 Wn. App. at 812.

In *State v. Gonzales Flores*, 164 Wn.2d 1 (2008), Octavio Flores successfully challenged the sufficiency of the evidence used to convict him of twice involving a minor in a drug transaction. Flores and his wife sold cocaine to a confidential informant. The Flores' minor daughter, Jessica, was present during two of the transactions. During the first transaction, Jessica sat passively on a bench while her parents sold the informant cocaine. During the second transaction, Jessica sat on a couch in the cabin's living room while her parents sold the informant more cocaine. Flores appealed his convictions, arguing that allowing a minor to remain present during a drug transaction is not alone a violation of the statute. Our Supreme Court agreed, holding that the appropriate inquiry is whether or not a defendant committed an overt act intended to bring the minor into the transaction. It found the evidence against Flores insufficient, where his actions toward Jessica were "purely passive." *Gonzales Flores*, 164 Wn.2d at 17.

In *Gonzales Flores*, our high court distinguished the facts from a federal court of appeals decision, *United States v. Castro-Hernandez*, 258 F.3d 1057 (9th Cir. 2001), in which a defendant attempted to cross into the United States from Mexico with forty-six kilograms of marijuana in his vehicle and his young son at his side. The Ninth Circuit Court of Appeals affirmed the federal district court's determination that the defendant's admission that he made a special stop at home to pick up his son, after the drugs were loaded into his truck, raised a reasonable inference that the defendant sought to use his

young son as a decoy. *Castro-Hernandez*, 258 F.3d at 1060.

In the case on appeal, the State of Washington presented sufficient evidence for the jury to reasonably infer that Arturo Huerta attempted to use Suzanna Rodriguez as a decoy or lookout, during the transaction. The jury heard testimony that Huerta brought Rodriguez to the Walmart and this particular Walmart lay significantly farther from Rodriguez's house than other stores, including another Walmart. Horbatko also testified that Huerta and Rodriguez arrived at the Walmart together, exited the tan Honda Accord and looked around, and, when the confidential informant approached, Rodriguez walked from the transaction and stood in another spot peering around. The State also argued that Rodriguez's distress on her arrest created a reasonable inference that Rodriguez was upset that she had failed in her decoy duties. This was sufficient evidence for a jury to reasonably infer that Huerta involved Rodriguez in the drug transaction, as either a decoy or a lookout.

Arturo Huerta asks us to consider the trial court's conversation with the jurors, after the rendering of the verdict. During the conversation, one or more jurors informed the court that the jury did not believe that Suzanna Rodriguez performed as a lookout. Huerta asks that we combine the jurors' disclosure with the trial court's finding, during sentencing, of a lack of evidence that Rodriguez was aware of the transaction.

We do not base our resolution of sufficiency of evidence assignments of error based upon jury comments. Courts generally do not inquire into the internal process by

41

which the jury reaches its verdict. *Gardner v. Malone*, 60 Wn.2d 836, 840, 376 P.2d 651, 379 P.2d 918 (1962). A juror's postverdict statements regarding the way in which the jury reached its verdict cannot be used to support a motion for a new trial. *Breckenridge v. Valley Gen. Hosp.*, 150 Wn.2d 197, 205, 75 P.3d 944 (2003). Sufficient evidence existed for a reasonable jury to conclude that Suzanna Rodriguez acted as a lookout.

Arturo Huerta also argues that Rodriguez's handling of the purchase money at the time of the arrest lacked spatial and temporal proximity to the delivery by Huerta to the confidential informant such that Huerta did not "involve" Rodriguez in a drug "transaction" within the meaning of RCW 69.50.4015(1). Since sufficient evidence supports a conclusion that Rodriguez performed as a lookout, we need not entertain this additional argument.

*Issue 9: Did the prosecution engage in misconduct by testimony elicited from Erik Horbatko?*

*Answer 9: No.*

Arturo Huerta next contends that the State committed prosecutorial misconduct in two ways: (1) by eliciting testimony from Detective Horbatko designed to inflame the jury, and (2) by expanding the charges against Huerta in closing argument. We address these contentions in such order. Huerta argues, in part, that the prosecutor elicited testimony from Detective Horbatko regarding the dangerousness of conducting drug sting operations and referring to the time that they waited for Huerta to arrive as "doper time."

42

A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial. *State v. Emery*, 174 Wn.2d 741, 756, 278 P.3d 653 (2012). Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned, and more on whether the resulting prejudice could have been cured. *State v. Emery*, 174 Wn.2d at 762. Under this heightened standard, the defendant must show that (1) no curative instruction would have obviated any prejudicial effect on the jury, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. *Emery*, 174 Wn.2d at 760-61. A prosecutor's conduct may be improper when he or she appeals to jurors' fear and repudiation of criminal groups. *State v. Ramos*, 164 Wn. App. 327, 338 n.3, 263 P.3d 1268 (2011); *State v. Perez-Mejia*, 134 Wn. App. 907, 916, 143 P.3d 838 (2006).

We do not comment on the admissibility of the testimony about which Arturo Huerta complains. We share in Huerta's criticism that Detective Erik Horbatko inserted the "doper" comment without a question eliciting the response and for the purpose of unfairly ridiculing Huerta. Nevertheless, Huerta does not assign error to the trial court's rulings regarding the testimony. Even considering the testimony irrelevant and prejudicial, the evidence did not likely affect the jury's verdict. The jury heard overwhelming testimony supporting the intent to deliver charge and sufficient evidence supporting the involving a minor charge. In his brief, Huerta summarily argues that

43

Horbatko's testimony prejudiced him but he fails to expand on the argument and explain the prejudice.

Arturo Huerta also complains that Detective Erik Horbatko allegedly commented on Huerta's silence and testified that the confidential informant never informed him that someone would accompany Huerta to the Walmart store. The prosecution did not elicit Horbatko's comment on Huerta's silence. Instead, Horbatko remarked that Huerta would not speak to the police, during aggressive questioning by defense counsel as to why Horbatko had not found assets of Huerta to seize and forfeit. Horbatko's answer was a legitimate response to the questioning. Huerta did not object to the response during the trial, and he cites no authority on appeal that the answer was impermissible. Huerta also did not object at trial to Horbatko's testimony based on the detective's conversation with the informant. On appeal, Huerta does not argue that the testimony was inadmissible and identifies no prejudice from the testimony.

Arturo Huerta also complains about the prosecution asking about a romantic relationship between Huerta and Suzanna Rodriguez. Huerta contends that the State agreed not to ask about Rodriguez saying "I love you" to Huerta unless Huerta opened the door. We agree the State so agreed and stated it would discuss asking the question before posing the question before the jury. The State reneged on this agreement when asking Rodriguez about her statement without first approaching the court and defense counsel. Whereas we do not condone the State's conduct, we do not find the behavior

flagrant and prejudicial. Arturo Huerta placed Suzanna Rodriguez's credibility at issue when he called her to testify.

Cross-examination to elicit facts tending to show that a witness' testimony was motivated by bias may not be unduly restricted. *State v. Francis*, 228 Conn. 118, 123, 635 A.2d 762 (1993). Bias may consist of a friendly feeling. *State v. Christian*, 267 Conn. 710, 748, 841 A.2d 1158 (2004). The interest of a witness, either friendly or unfriendly, in the prosecution or in a party is not collateral and may always be proved to enable the jury to estimate credibility. *Miller ex rel. Monticello Banking Co. v. Marymount Med. Ctr.*, 125 S.W.3d 274, 282 (Ky. 2004).

*Issue 10: Did the prosecution engage in misconduct during summation?*

*Answer 10: No.*

Finally, Arturo Huerta argues that the State committed prosecutorial misconduct by misstating the law and the facts of Huerta's case during its closing argument. He claims that the State expanded the charges through closing argument. We disagree.

This court reviews a prosecutor's comments during closing argument in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Boehning*, 127 Wn. App. 511, 519, 111 P.3d 899 (2005). Allegedly improper remarks by the prosecution must be viewed in the context of the entire argument, and a prosecutor enjoys wide latitude in drawing and expressing reasonable inferences from the evidence. *State v. Gentry*, 125 Wn.2d 570,

45

596, 888 P.2d 1105 (1995), *aff'd sub nom. Gentry v. Sinclair*, 705 F.3d 884 (9th Cir. 2013). Nevertheless, a prosecutor's statements are improper if they misstate the applicable law, shift the burden to the defense, mischaracterize the role of the jury, or invite the jury to determine guilt on improper grounds. *Emery*, 174 Wn.2d at 759-60; *Boehning*, 127 Wn. App. at 522. If a defendant did not object to a prosecutor's alleged misconduct at trial, he or she is deemed to have waived any error, unless the misconduct was so flagrant and ill-intentioned that a jury instruction could not have cured the resulting prejudice. *Gentry*, 125 Wn.2d at 596.

The conduct of which Arturo Huerta complains was neither flagrant, nor ill intentioned. The State argued its theories of the case to support the charges in the information. It did not assert new charges. The State contended that Huerta had recently delivered drugs to the States' confidential informant and thus the jury could infer possession with intent to deliver. The State also argued that the jury could infer from Suzanna Rodriguez's behavior and the discovery of money in her bra later that she had acted as either a decoy or lookout for Huerta. The contentions did not amount to an impermissible amending of the charges, as the substantive crimes with which the State charged Huerta remained the same. Huerta never objected to the argument during trial.

*Issue 11: Does cumulative error require reversal?*

*Answer 11: No.*

Under the cumulative error doctrine, a defendant may be entitled to a new trial if

the trial court's multiple errors combined to deny the defendant a fair trial. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). The defendant bears the burden of proving an accumulation of error of sufficient magnitude to warrant a new trial. *Lord*, 123 Wn.2d at 332; *see, e.g., State v. Perrett*, 86 Wn. App. 312, 323, 936 P.2d 426 (1997).

Our trial court committed only one error by allowing testimony about matching currency in violation of the prohibition against hearsay. This error was harmless in light of the remaining untainted evidence supporting Arturo Huerta's two convictions.

## CONCLUSION

We affirm Arturo Huerta's convictions for possession of a controlled substance with intent to deliver and involving a minor in a narcotics transaction.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Fearing, J.

WE CONCUR:

Siddoway, C.J.

Lawrence-Berrey, J.

47